**"EXHIBIT A "**



## THEATRICAL ADHERENCE LETTER

Dear Producer:

This will set forth our understanding and agreement as follows:

1. The undersigned Producer hereby acknowledges receipt of the Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, the 1998 Memorandum of Agreement and the 2001 Memorandum of Agreement (herein called the "Agreement") which sets forth the terms and working conditions for performers and extra performers. It is agreed that this letter is part of the aforesaid Agreement and, by executing this letter, the undersigned Producer and Screen Actors Guild (herein called the "Guild") shall be deemed to have executed said Agreement.

2. Producer agrees to give the Guild at least fifteen (15) working days advance notice of the commencement of each production within the scope of the aforesaid Agreement.

3. Producer agrees that prior to the commencement of principal photography of each motion picture to be produced hereafter, if Producer is not also the Distributor on free television or in supplemental markets of such picture, Producer shall obtain from the Distributor having such distribution rights a separate written Agreement called "Distributor's Assumption Agreement", made expressly for the benefit of the Guild as representative of the performers involved by which such Distributor agrees to assume and pay the amounts required by the aforesaid Agreement by reason of the exhibition of such picture on free television and in supplemental markets when such sums become payable. The form of such Assumption Agreement is attached hereto.

4. The Guild may, in its discretion, require financial assurances with respect to each and every motion picture produced hereunder, in the form of a bond, cash deposit, security agreement, and/or other appropriate form, where it appears to the Guild to be necessary for the protection of the performers employed by Producer.

5. Failure to comply with the foregoing provisions with respect to any motion picture to be produced hereunder shall be a substantial breach of this Agreement, and the Guild shall have the right to withhold the services of its members with respect to any such motion picture until such provisions are satisfied.

Very truly yours,

ACCEPTED AND AGREED:

SCREEN ACTORS GUILD

SHADOWBOXER LLC
(Company)

By: _____
(Signature)

By: _____

Date: 9.14.04

Lee Daniels - Manager
(Print Name and Title)

51 North 3rd Street, #321
(Address)

Philadelphia, PA 19106

Date: 11-1-04

**"EXHIBIT B "**

Please note:
COMPLETE ALL BLANKS IN THIS SECURITY AGREEMENT

Form 7 - Theatrical

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated as of <u>April 20, 2004</u>, between <u>Shadowboxer, LLC</u> ("Debtor" or "Producer") and Screen Actors Guild, Inc. ("Secured Party" or "Guild") with respect to the motion picture entitled "<u>Shadowboxer</u>" (the "Picture"), makes the "Collateral," as that term is defined in Paragraph 2 below, security for all of Producer's present and future obligations, debts, and duties to the Guild relating to the Picture under the Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, as amended by the 1998 Memorandum of Agreement, and the 2001 Memorandum of Agreement, and all present and future amendments thereto and replacements therefor (collectively, the "Collective Bargaining Agreement").

In consideration of the mutual representations, warranties, covenants, and agreements in this Security Agreement, and for good and valuable consideration which Debtor and Secured Party acknowledge as received and sufficient, the parties agree:

1.　　Secured Obligations. This Security Agreement secures the following obligations (collectively, the "Secured Obligations"):

(a)　　payment to the Guild, as collective bargaining representative of the employees now or hereafter employed in making the Picture (the "Performers"), all sums now or hereafter due under the Collective Bargaining Agreement (singly and collectively, "Monetary Obligations") including, but not limited to, paying Performers the agreed compensation for services performed or to be performed in connection with the Picture as well as compensation for overtime as applicable, meal period violations, rest period violations, premium pay, compensation owed under any guarantee for services performed or to be performed by Performers, all additional compensation payable to Performers when the Picture is distributed, exploited, or exhibited on free television or in supplemental markets including, but not limited to, all payments due by reason of the re-use of any part of the Picture's photography or soundtrack, applicable charges for liquidated damages and late payments, and pension and health contributions as applicable under the Collective Bargaining Agreement for the benefit of the Performers;

(b)　　full, timely, and faithful performance of all terms and obligations contained in or contemplated by this Security Agreement, the Collective Bargaining Agreement, or any other present or future agreement between Producer and the Guild in connection with the Picture, and all extensions, renewals, amendments, and modifications thereto including, without limitation, delivering all written reports required under the Collective Bargaining Agreement relating to distribution of the Picture in any market, territory, or media with respect to which payments are required, and obtaining from any distributor or buyer of the

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

Picture a Distributor's or Buyer's Assumption Agreement and delivering same to the Guild; and

(c)     all new obligations relating to the Picture incurred after this Security Agreement is executed including, without limitation, all Monetary Obligations, absolute or contingent, now existing or hereafter arising, of Producer to the Guild.

2.     <u>Grant of Security Interest</u>.  As security for the full and timely payment and performance of all Secured Obligations, Producer grants to the Guild a continuing security interest of first priority, subject to Paragraph 3(h) below, in the following (collectively, the "Collateral"):  All rights, title, and interest of Producer throughout the universe in the Picture and all allied, ancillary, and subsidiary rights, and all properties and things of value pertaining to the Picture, whether now existing or hereafter made, acquired, or produced including, without limitation, all screenplays, motion picture photoplays, and all other tangible and intangible manifestations of any copyrightable interest relating to the Picture, and all existing or hereafter acquired rights, title, interest, and property of Producer described in Paragraphs (i) through (xx) below to the extent they relate to the Picture or the Picture's production or exploitation (as further defined in the attached Exhibit A and incorporated in this Security Agreement by reference).

    (i)     Accounts;
    (ii)    Chattel Paper;
    (iii)   Contracts;
    (iv)    Copyrights;
    (v)     Copyright Licenses;
    (vi)    Documents;
    (vii)   General Intangibles;
    (viii)  Instruments;
    (ix)    Insurance and Insurance Policies;
    (x)     Inventory;
    (xi)    Merchandising Rights;
    (xii)   Music Rights;
    (xiii)  Personal Property;
    (xiv)   Physical Properties;
    (xv)    Proceeds;
    (xvi)   Product;
    (xvii)  Rights in Product;
    (xviii) Trademarks;
    (xix)   Trademark Licenses; and
    (xx)    All substitutions, additions, and accessions to all of the foregoing; all guaranties of and security for all of the foregoing; and all books and records relating to all of the foregoing.

V3510 D327   Page 2

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

3.  General Representations, Warranties and Covenants.

  (a)  Producer represents and warrants that:

  (i)  Producer's mailing address, telephone, and facsimile numbers are:

39 West 131st Street - Suite 2
New York, NY  10037

Telephone: 646 - 548 - 0930
Facsimile: 646 - 548 - 9883

  (ii)  The address of Producer's chief executive office and chief place of business is (if different from above mailing address):

  (iii)  The address at which Producer keeps its records concerning Accounts and Contracts is (if different from above mailing address):

  (iv)  The negatives in connection with the Picture will be processed by:

Name:  Technicolor
Address:  321 W. 44th Street
New York, NY  10036

  (v)  The positive copies for distribution of the Picture will be made by (if different from above):

Name:
Address:

V3510 D327    Page 3

(vi)    The Physical Properties will be kept at (if different from above):

Name: _____
Address: _____
_____
_____

(vii)    The Picture will be distributed by (include territories, media, and license term for each distributor):

(b)    Producer shall keep at all times at least one complete set of its records concerning the Collateral at its chief place of business as designated above in Paragraph 3(a)(ii). Producer shall not change the location of its chief place of business or chief executive office without giving the Guild at least thirty (30) days prior written notice of that change and taking all steps that, in the Guild's opinion, are necessary or advisable to continue the perfection and priority of the security interest granted under this Security Agreement.

(c)    Upon the Guild's request, Producer shall execute and cause any third party which possesses or will possess any Physical Properties including, without limitation, any film laboratory to execute a pledgeholder agreement or agreements (in a form satisfactory to the Guild) designating the Guild as pledgee.

(d)    Producer agrees to execute and deliver further agreements, contracts, documents, and instruments (in a form satisfactory to the Guild) as the Guild may require to perfect, protect, or maintain the security interest created under this Security Agreement.

(e)    Producer shall, upon the Guild's request, deliver to the Guild satisfactory evidence that the Picture and underlying literary rights have been properly registered in the United States Copyright Office and in other places where motion picture copyrights are customarily secured.

(f)    Producer shall, upon the Guild's request, execute and deliver to the Guild a Mortgage and Assignment of Copyrights in a form acceptable to the Guild and sufficient to constitute, when recorded in the United States Copyright Office, a first and prior lien upon the Copyrights, except for permitted senior security interests or liens disclosed in and subject to Paragraph 3(h) below.

(g)    (i)    If a corporation or a limited liability company ("LLC"), Producer represents and warrants that its correct and legal name is _____
Shadowboxer , LLC

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327    Page 4

and (as applicable) that it is a corporation or LLC duly organized and existing under the laws of the State of _____, is in good standing in that State, is legally qualified to do business in any state in which Producer is employing Performers, and is empowered and authorized to enter into and perform its obligations under this Security Agreement by its Articles of Incorporation, By-Laws, and appropriate Resolutions of its Board of Directors, or its Articles of Organization and Operating Agreement.

(ii)    If a partnership or joint venture, Producer represents and warrants that its correct legal name is _____

_____, that it is a partnership or joint venture (as applicable) organized and existing under the laws of the State of _____, is in good standing in that State (as applicable), is legally qualified to do business in any state in which Producer is employing Performers, and is authorized to enter into and perform its obligations under this Security Agreement by its Partnership Agreement or Joint Venture Agreement dated as of _____. All fictitious business names for the partnership or joint venture are as follows:

_____

(iii)    Producer agrees not to change its name, identity, corporate structure, or state of incorporation or organization unless it gives the Guild at least thirty (30) days prior written notice of the change and takes all steps that, in the opinion of the Guild, are necessary or advisable to continue the perfection and priority of the security interest granted under this Security Agreement. Producer's failure to provide such prior written notice will not constitute a default under this Security Agreement if the change has no adverse effect on the Guild's secured party status or rights under this Security Agreement, and Producer provides written notice of the change to the Guild within thirty (30) days of its effective date.

(h)    Producer represents and warrants that except as otherwise stated in this Security Agreement, Producer holds and owns all Copyrights in and to the Literary Property, and owns or will own when the Picture is completed, full and unimpaired title in and to the Collateral, free and clear of liens except for the lien and security interest created by this Security Agreement and the perfected security interest(s), if any, in favor of

_____
_____
_____

Producer represents and warrants that it has not granted and will not grant a prior security interest or lien in any of the Collateral to any other entity or person other than as listed above, and as of the date of this Security Agreement, there are no adverse claims against any of the Collateral. If Producer has granted or will grant a prior security interest or lien to any lender or completion guarantor in connection with the Picture, the parties have

5

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327   Page 5

entered into or, upon the Guild's request, will enter into a written Intercreditor Agreement on the Guild's standard form which provides, inter alia, that lender and completion guarantor will assume or cause all of the obligations under this Security Agreement to be assumed if lender or completion guarantor, singly or jointly, exercise the right of foreclosure. If Producer has granted or will grant a prior security interest or lien in any of the Collateral to any entity or person other than a lender or completion guarantor, Producer shall obtain a written agreement (in a form satisfactory to the Guild) from that entity or person acknowledging that its security interest is subject and subordinate to the security interest created under this Security Agreement. Any action by a subordinate secured party against any of the Collateral, including without limitation, retention of cash proceeds, violates the rights of the Guild under this Security Agreement unless the Guild expressly consents to such action in writing. Producer's security interest in any part of the Collateral, if any, is subject and subordinate to the security interest created under this Security Agreement. Nothing contained in this Security Agreement constitutes the Guild's agreement to subordinate its security interest to the rights of any lender or any other party.

(i)     Producer covenants that the Guild has and will have, at all times for the term of this Security Agreement, a first priority security interest in the Collateral subject to Paragraph 3(h) above. Producer agrees to defend, at its own cost and expense, its title, rights, and property in the Collateral, and to defend this Security Agreement as creating a prior and superior security interest and first lien in the Collateral except for the permitted senior security interests or liens disclosed in and subject to Paragraph 3(h) above. Producer further agrees that it (or Producer's insurance company, as applicable) will defend, at its own cost and expense, the Collateral (including the right to exhibit and exploit the Picture, and the Guild's rights as Secured Party) against all claims of infringement, and against all claims of anyone for any cause including, without limitation, claims arising out of or resulting from the use in the Picture of any story, adaptation, idea, impersonation, character, photograph, music, musical composition, or other material.

(j)     Producer shall not permit any lien, charge, encumbrance, security interest, distribution agreement, or license to accrue or be acquired upon or against the Collateral or rights in the Collateral which may be, or become prior or superior to the Guild's rights, title, interest, liens, and claims under this Security Agreement or otherwise, except as permitted under Paragraph 3(h) above. Producer shall advise the Guild promptly, in reasonable detail, of (i) any lien (other than liens created or permitted under this Security Agreement) on any of the Collateral of which it has knowledge; (ii) any material claim asserted against any of the Collateral of which it has knowledge; and (iii) any other event which could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or the lien created under this Security Agreement.

(k)     The following liens, charges, security interests, encumbrances, and adverse claims (collectively, the "Liens") are permitted liens under this Security Agreement: (i) Liens

V3510 D327   Page 6

existing (as of the date of this Security Agreement) disclosed in and subject to Paragraph 3(h) above; (ii) Liens for taxes, fees, assessments, or other governmental charges or levies either not delinquent or being contested in good faith by appropriate proceedings, provided those liens have no priority over the Guild's security interest in the Collateral; (iii) Liens of materialmen, mechanics, warehousemen, or carriers, or other like possessory Liens arising in the ordinary course of business and securing obligations either not delinquent or being contested in good faith by appropriate proceedings diligently pursued; (iv) any judgment or attachment lien, execution on which has been effectively stayed, and which has been fully bonded against within twenty (20) days after its entry under the applicable judgment or law; and (v) junior liens granted to distributors or other guilds.

(l)     Producer shall pay all taxes, liens, and assessments levied against any of the Collateral when the same become due and before becoming delinquent, unless being contested in good faith by appropriate proceedings, provided they have no priority over the Guild's security interest in the Collateral.

(m)     Producer agrees that upon reasonable notice, at reasonable times, and during normal business hours, the Guild has the right to inspect the Producer's books and records relating to the Collateral, the proceeds thereof, and the processing or collection thereof. Producer further agrees, upon the Guild's request, to furnish other reports, data and financial statements (including audit reports by independent certified public accountants), books and records relating to the Collateral and its proceeds, and chain-of-title documentation relating to the Picture as the Guild may reasonably require.

(n)     Producer is not obligated to obtain the consent of any person in connection with executing, delivering, and performing its obligations under this Security Agreement.

4.     Events of Default.  Occurrence of any of the following events constitutes a default and an "Event of Default" for purposes of this Security Agreement, and Producer shall provide the Guild with immediate written notice thereof: (a) any warranty, representation, statement, report, or certificate now or hereafter made or delivered to the Guild by Producer or any of Producer's officers, employees, or agents in connection with the Collateral which is false or misleading in a material respect; (b) Producer fails to pay any Monetary Obligation when due (unless that failure is remedied within thirty (30) days after the Guild gives Producer written notice of this default); (c) Producer sells, transfers, or assigns any rights or interest in the Collateral without complying with the requirements of Paragraph 8 below; (d) Producer fails to perform when due any other Secured Obligation (unless that failure is remedied within thirty (30) days after the Guild gives Producer written notice of this default); (e) any levy, attachment, execution, or other writ is made on any part of the Collateral or a substantial part of Producer's assets which continues for more than forty-five (45) days; (f) the appointment of a receiver, trustee, or custodian, for any of the property of, or assignment for the benefit of creditors by Producer, or the commencement of any proceeding by Producer under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327 Page 7

hereafter in effect, or the filing of an answer admitting the material allegations of any such proceeding filed against Producer; (g) commencement of any proceeding against Producer under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect, unless dismissed within forty-five (45) days after the date commenced; (h) any failure to pay when due any tax, levy, or assessment on any of the Collateral which results in or is secured by a lien on any of the Collateral, unless Producer is contesting that lien in good faith by appropriate proceedings promptly instituted and diligently pursued, and Producer posts a bond or takes other appropriate action to ensure that none of the Collateral is forfeited, sold, executed on, foreclosed on, or otherwise realized on as a result of the failure to pay any tax, levy, or assessment; (i) Producer conceals, removes, or transfers any of the Collateral with intent to hinder, delay, or defraud its creditors, or makes or suffers any transfer of the Collateral which is fraudulent under any bankruptcy, fraudulent conveyance or similar law; (j) the winding up, liquidation, or dissolution of Producer and distribution of its assets, or the adoption of a plan for same, provided that this will not constitute an Event of Default if Producer is not otherwise in default under this Security Agreement, the successor-in-interest has assumed in writing all obligations under this Security Agreement in a form satisfactory to the Guild, the Guild approves of the creditworthiness of any successor-in-interest, and the successor-in-interest executes and delivers a Security Agreement in this form and all other documents and instruments reasonably specified by the Guild to provide the Guild with a first priority, perfected security interest in all present and future Collateral of the successor-in-interest subject to Paragraph 3(h) above; or (k) suspension of Producer's corporate, LLC, or partnership status (as applicable) by any applicable regulatory authorities, unless such status is reinstated within forty-five (45) days.

5.    Remedies Upon Event of Default. If an Event of Default occurs, the Guild has all of the rights and remedies available to a secured party under the California Commercial Code (the "Code") in effect on the date of this Security Agreement, under other applicable law or in equity, under this Security Agreement, and under any other present or future agreement it has with Producer in connection with the Collateral including, without limitation, the following:

(a)    Remedies; Obtaining the Collateral Upon Default. Upon an Event of Default, the Guild may do any one or more of the following:

(i)    instruct the obligor or obligors on any Account, Instrument, General Intangible, or other obligation constituting Collateral to make any payment relating to the Collateral directly to the Guild;

(ii)    in accordance with Paragraph 5(b)(i) below, sell, assign, grant distribution rights in, or otherwise liquidate, or direct Producer to sell, assign, grant distribution rights in, or otherwise liquidate, any of the Collateral and take possession of the Proceeds of the sale or liquidation; and

8

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

(iii)    take possession or control of any of the Collateral by directing Producer in writing to deliver it to the Guild at any place or places designated by the Guild, in which event Producer shall at its own expense:

(a)    immediately cause the applicable Collateral to be moved to the place or places designated by the Guild and there delivered to the Guild; and

(b)    store and keep any Collateral so delivered to the Guild at such place or places pending further action by the Guild as provided in Paragraph 5(b) below.

Producer's obligation to deliver the Collateral is of the essence of this Security Agreement and, upon application to a court of equity having jurisdiction, the Guild shall be entitled to a decree requiring specific performance of this obligation.

(b)    Remedies: Disposition of the Collateral.  Any Collateral repossessed or controlled by the Guild under Paragraph 5(a) above, and any Collateral whether or not repossessed or controlled by the Guild may be sold, assigned, leased, licensed, or otherwise disposed of by the Guild under one or more contracts, by territory, by media, or as an entirety, without gathering the property to be sold at the place of sale, and in general in a manner, at a time or times, at a place or places and on terms that the Guild may, in compliance with any requirements of applicable law, determine to be commercially reasonable.

(i)    If an Event of Default occurs, the Guild is entitled to sell, license, lease, or grant distribution rights in any of the Collateral, in a commercially reasonable manner, and in the condition in which the same existed when taken by the Guild or after any completion, editing, overhaul, or repair which the Guild determines to be commercially reasonable subject to any non-disturbance agreement between the Guild and any distributor relating to the Picture.  Any private sale or other like disposition of the Collateral by the Guild, other than a grant of distribution rights undertaken by the Guild required solely to preserve the value of the Collateral (in which case, the Guild shall give Producer at least two (2) days prior written notice of that transfer), shall be made upon not less than ten (10) business days written notice to Producer (which Producer acknowledges is a commercially reasonable period of time) specifying the date on or after which the private sale or other like disposition is to occur.  Any public sale or other like disposition shall be made upon not less than ten (10) business days written notice to Producer (which Producer acknowledges is a commercially reasonable period of time) specifying the date, time, and place of the sale and after publication of notice of the sale as required under applicable law.  The Guild may, in its discretion, establish reserves and minimum bids at any public sale, and adjourn any public sale from time to time without notice other than oral announcement at the time scheduled for that

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327   Page 9

sale. If applicable law requires the Guild to dispose of the Collateral within a period of time which does not permit giving notice to Producer as specified above, the Guild need give Producer only such notice of disposition as is reasonably practicable in view of the applicable law.

(ii)     The Guild may, directly or through any affiliate, purchase any of the Collateral at any public disposition and, if permissible under applicable law, at any private disposition of the Collateral.

(iii)     Any sale or other disposition of the Collateral does not relieve Producer of any liability Producer may have if any Collateral is defective as to title, physical condition, or otherwise at the time of sale.

(iv)     As a condition of any sale, the Guild may (but is not obligated to) require each purchaser to assume in writing the obligation to pay all additional compensation arising from purchaser's distribution, exhibition, or exploitation of the Picture payable under the applicable collective bargaining agreement of any guild holding a security interest in the Collateral.

(v)     Notwithstanding anything to the contrary in Paragraph 5(b)(i) above, the Guild's rights under this Security Agreement are not subject to any non-disturbance provisions referenced therein if the distributor is the Producer, affiliated with the Producer, or the distributor has entered into a security agreement with the Guild relating to the Collateral.

(c)     <u>Standards for Determining Commercial Reasonableness</u>.  Producer and the Guild agree that a sale or other disposition (collectively, the "sale") of any Collateral which complies with the following standards will be conclusively deemed commercially reasonable:

(i)     notice of the sale is given at least ten (10) business days before the sale and, if required under applicable law, in the case of a public sale, notice of the sale is published at least seven (7) business days before the sale in a newspaper of general circulation in the county where the sale will be conducted;

(ii)     notice of the sale describes the Collateral in general, non-specific terms, describes the Debtor and Secured Party, states the method of intended disposition, states the date, time, and place of a public sale or the time after which a private sale is to be made, and states that the Debtor is entitled to an accounting of the unpaid indebtedness, and the charge, if any, for such accounting;

(iii)     the sale is conducted at a place designated by the Guild with or without the Collateral being present;

(iv)     the sale commences at any time between 8:00 a.m. and 6:00 p.m.;

V3510 D327 Page 10

(v)    payment of the purchase price in cash or by cashier's check or wire transfer is required; and

(vi)    the Guild may (but is not obligated to) direct any prospective purchaser to ascertain directly from Producer information concerning the Collateral.

Specification of the above procedure does not imply that other methods of selling and otherwise disposing of Collateral are not commercially reasonable. Producer acknowledges that the Guild is not obligated to follow the foregoing procedure and may, in its discretion, follow other procedures which it considers commercially reasonable.

(d)    Application of Proceeds. The Guild shall apply all proceeds realized from its disposition of the Collateral as follows:

(i)    first, to pay all expenses and fees (including, but not limited to, reasonable attorneys' fees) which the Guild incurs in obtaining, taking possession of, removing, insuring, completing, repairing, appraising, storing, or disposing of any Collateral and otherwise in connection with the Guild's exercise of its rights and remedies;

(ii)    next, any surplus then remaining to satisfy the Secured Obligations in the order the Guild determines in its sole discretion; and

(iii)    next, any surplus then remaining shall be paid to Producer subject to Paragraph 8(b) below and the requirements for such disposition under the Code. If permitted by applicable law, Producer remains liable to the extent of any deficiency between the amount of the proceeds derived from the Guild's sale of the Collateral and the aggregate amount of the sums referred to in Paragraphs 5(d)(i) and 5(d)(ii) above.

(e)    Remedies Cumulative. The rights, powers, and remedies provided in this Security Agreement are cumulative and do not exclude the exercise of any rights, powers, or remedies otherwise available to the Guild. No failure or delay by the Guild to exercise any right, power, or privilege under this Security Agreement or any other agreement between Producer and the Guild relating to the Collateral impairs any such right, power, or privilege, and no course of dealing between Producer and the Guild shall be construed to be a waiver thereof. No single or partial exercise of any right, power, or privilege or single or partial waiver of a breach or default under this Security Agreement, the Collective Bargaining Agreement, or any other agreement between Producer and the Guild in connection with the Collateral precludes any further or other exercise of the same or any other right, power, or privilege nor constitutes a waiver of any other breach or default. No notice to or demand on Producer in any case shall entitle Producer to any further notice or demand in similar or other circumstances or constitute a waiver of any

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327 Page 11

right of the Guild to take any action without notice or demand. The failure of the Guild at any time or times to require Producer to strictly comply with any of the provisions of this Security Agreement or any other present or future agreement between Producer and the Guild shall not waive or diminish any right of the Guild later to demand and receive strict compliance therewith. Any waiver, consent, or approval under this Security Agreement must be in writing to be effective.

(f)     Discontinuance of Proceedings. If the Guild institutes any proceeding to enforce any right, power, or remedy under this Security Agreement and discontinues or abandons that proceeding for any reason, Producer and the Guild will be restored to their former positions and rights with respect to the Collateral subject to the security interest created under this Security Agreement, and all rights, remedies, and powers of the Guild will continue as if no such proceeding had been instituted.

6.     Producer waives and agrees not to plead, invoke, or set up any statute of limitations as a defense to any action or proceeding for payment of any Monetary Obligations, performance of any Secured Obligation, or enforcement of any term or provision of this Security Agreement. In any action by the Guild upon any of the Secured Obligations or the security interest hereunder, other than the filing of a lawsuit predicated on a breach of this Security Agreement, the Guild is entitled to recover from Producer its costs incurred in those proceedings including attorneys' fees in a reasonable amount, and those costs will be included in the Monetary Obligations secured under this Security Agreement.

7.     Attorney In Fact.

(a)     Producer irrevocably appoints the Guild its true and lawful attorney-in-fact, with full power of delegation, substitution, and assignment (but not the obligation), to execute, deliver, file, and record on its behalf and in its name Financing Statements, renewals thereof, and all other statements and agreements consistent with the terms of this Security Agreement necessary or desirable to perfect, protect, evidence, renew, or continue the security interest in the Collateral created hereunder, or to effectuate the purposes and intents of this Security Agreement. Producer ratifies and confirms all the Guild may do in that regard, acknowledging that this power of attorney is coupled with an interest.

(b)     If an Event of Default occurs, Producer irrevocably appoints the Guild its true and lawful attorney-in-fact, with full power of delegation, substitution, and assignment (but not the obligation) to do all of the above in Paragraph 7(a) and in addition, to execute, deliver, file, and record, on Producer's behalf and in Producer's name in connection with the Collateral, contracts, documents, and instruments, to endorse and negotiate checks, drafts, and other orders for the payment of moneys payable to Producer in connection with the Collateral, and to do other acts as the Guild, in its sole discretion, deems necessary or desirable to carry out the purposes and intents of this Security Agreement. Producer ratifies and confirms all the Guild may do in that regard, acknowledging that

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327   Page 12

this power of attorney is coupled with an interest, and agrees to pay all related costs and expenses.

(c)     Producer shall pay the cost of filing documents in all state and federal public offices and other places where the Guild deems it desirable or necessary to perfect, continue, or protect the security interest created under this Security Agreement, and the cost of all searches in all such offices which the Guild deems necessary.

8.     Continuing Assignment of and Security Interest in Collateral.

(a)     This Security Agreement creates a continuing assignment of, and security interest in, the Collateral and remains in full force and effect until terminated by Producer and the Guild by mutual written agreement. If Producer sells, transfers, assigns, or otherwise disposes of any of the Collateral or rights therein, Producer agrees that such sale, transfer, assignment, or disposition of the Collateral is subject to the security interest created under this Security Agreement.

(b)     Except for the granting of distribution rights in the Picture which is governed by Paragraph 8(c) below, Producer shall provide the Guild with written notification of any sale, transfer, assignment, or other disposition of any part of the Collateral (collectively, "Transfer") ten (10) days before the Transfer and agrees to require the purchaser, transferee, or assignee, before or concurrent with the Transfer, to execute and deliver to the Guild a Buyer's Assumption Agreement, a security agreement (substantially in the form of this Security Agreement), UCC-1(s), any other documentation necessary to perfect the Guild's security interest in the acquired rights, and any other document required under the Collective Bargaining Agreement or this Security Agreement (collectively, the "Guild Security Documents") unless the Guild expressly waives those requirements in writing. Producer will not be relieved of any obligations under this Security Agreement or the Collective Bargaining Agreement unless (i) the Guild approves in writing the financial responsibility of the purchaser, transferee, or assignee; and (ii) the purchaser, transferee, or assignee delivers the Guild Security Documents to the Guild. No failure of the Guild to request any of the foregoing, or Producer's failure to provide any of the foregoing affects the Guild's first priority, perfected security interest in the Collateral, subject to Paragraph 3(h) above, which will continue in full force and effect.

(c)     Without limiting the generality of Paragraph 8(b) above, Producer agrees that all grants of distribution rights, licensing agreements, or similar agreements in connection with the Picture are and will continue to be expressly subject and subordinate to the Guild security interest created under this Security Agreement. Producer shall promptly furnish the Guild with the names and addresses of all distributors. Nothing in this Security Agreement constitutes the Guild's acceptance, ratification of, or subordination of its interest to the rights of any party under any contract or agreement which Producer has entered into or may subsequently enter into with respect to the Collateral including, without limitation, any distribution or license agreement. No failure of the Guild to

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327 Page 13

request any of the foregoing, or Producer's failure to provide any of the foregoing, affects the Guild's first priority, perfected security interest in the Collateral, subject to Paragraph 3(h) above, which will continue in full force and effect.

(d)     Notwithstanding anything contained in this Paragraph 8, if a "Qualified Distributor" (as defined in the Collective Bargaining Agreement) acquires rights to distribute the Picture and assumes responsibility for the payment of Residuals for the specific territories and media acquired by such QD, or guarantees in a written form satisfactory to the Guild all of Producer's obligations with respect to the payment of Residuals, then the Guild (i) agrees to modify the definition of Collateral to exclude those territories and media for the term acquired by such QD including renewals and extensions; (ii) agrees to acknowledge such QD's continuing rights of full, unlimited but non-exclusive access to and use of any and all physical items and elements relating to the Picture; and (iii) shall not require the delivery of the Guild Security Documents with respect to the rights acquired by such QD.

(e)     No delay or omission by the Guild in exercising any right under this Security Agreement waives such right or releases the Guild's security interest in the Collateral.

9.     Severability. If any term or provision of this Security Agreement is held to be invalid under any law, statute, judicial decision, rule or regulation of any competent jurisdiction, the remainder of its terms and provisions will remain in full force and effect.

10.     Integration. This Security Agreement and other written documents as may be executed in connection with this Security Agreement are the final, entire, and complete agreement between Producer and the Guild relating to the grant of a security interest in the Collateral and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated into this Security Agreement. There are no oral understandings, representations, or agreements between the parties relating to the grant of a security interest in the Collateral which are not in this Security Agreement or in other written agreements signed by the parties in connection with this Security Agreement.

11.     Governing Law. This Security Agreement and the rights and obligations of the parties shall be construed in accordance with and be governed by the laws of the State of California and the United States of America without reference to the principles of conflict of laws thereof.

12.     Jurisdiction and Service of Process. Producer and the Guild agree that any legal action or proceeding with respect to this Security Agreement, or any action or proceeding to execute or otherwise enforce any judgment or arbitration award obtained against Producer or any of its properties, may be brought in proceedings in Los Angeles County, California. By executing and delivering this Security Agreement, Producer irrevocably submits to such jurisdiction provided, however, that the Guild may bring suit in the courts of any country or place where Producer or any of its assets may be found and by executing and delivering this Security Agreement, Producer irrevocably submits to that jurisdiction. Producer irrevocably waives any objection

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327    Page 14

which it may have now or in the future to the venue of any suit, action, or proceeding arising out of or relating to this Security Agreement or any other contract between Producer and the Guild, or between Producer and Performers brought in the State of California, and irrevocably waives any claim that any such suit, action, or proceeding brought in the State of California is in an inconvenient forum. If any agent appointed by Producer refuses to accept service, Producer agrees that service upon it by mail sent to the mailing address specified by Producer in this Security Agreement constitutes sufficient notice and effective service. Nothing in this Paragraph 12 affects the right to serve process in any other manner permitted by law or limits the right of the Guild to bring proceedings against Producer in the courts of any other jurisdiction.

13.    Notices.

(a)    To the Guild:  The Producer shall give notices to the Guild required under this Security Agreement in writing by certified mail (return receipt requested), messenger or telecopier (but if telecopied, such notice shall be concurrently sent by mail) addressed as indicated below. The date of messengering or telecopying will be deemed the date of service. The date of receipt will be deemed the date of service for all notices sent by certified mail, return receipt requested.

Mail/Messenger:        SCREEN ACTORS GUILD, INC.
                       Legal Department
                       5757 Wilshire Boulevard
                       Los Angeles, California  90036-3600
                       Attention:  Vicki Shapiro, Esq.
Telecopier:            (323) 549-6624

With a courtesy
copy to:               GEFFNER & BUSH
                       3500 West Olive Avenue
                       Suite 1100
                       Burbank, California  91505
                       Attention:  Miriam López, Esq.
Telecopier:            (818) 973-3201

The Guild may change its address by giving written notice to Producer at the address for Producer in Paragraph 3(a) above.

(b)    To Producer:  The Guild shall give notices to Producer required under this Security Agreement in writing by mail, messenger, or telecopier addressed to Producer at the mailing address indicated above in Paragraph 3(a). The date of messengering or telecopying will be deemed the date of service. The date of receipt will be deemed the date of service for all notices sent by certified mail, return receipt requested. Notice sent by mail will be deemed effective five (5) days from the date of mailing within the United States or seven (7) days from the date of mailing across national borders. Notice to

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327 Page 15

Producer will be deemed effective if made in this manner and sent to the mailing address shown in Paragraph 3(a) above, or if Producer has notified the Guild in writing of a change in address, to the Producer's last address so notified. Demands or notices addressed to the Producer's address at which the Guild customarily communicates with the Producer will also be effective. Producer may change its address or addresses by giving written notice to the Guild at the Guild's address in Paragraph 13(a).

14. General.

(a) All of the Guild's rights under this Security Agreement will inure to the benefit of its successors and assigns. All obligations of Producer under this Security Agreement will bind its successors, assigns, and all persons who become bound as a debtor under this Security Agreement or applicable law.

(b) If there is more than one Producer, the term "Producer" as used in this Security Agreement means each Producer, their obligations under this Security Agreement are joint and several, and the compromise of any claim with, or the release of, any Producer will not constitute a compromise with, or release of, any other Producer.

(c) Section headings are for convenience only and do not affect the interpretation or construction of this Security Agreement.

(d) This Security Agreement does not create any rights enforceable by any person not a party to this Security Agreement.

(e) Secured Party is authorized to (i) date this Security Agreement (if not otherwise dated) the date it is delivered to Secured Party and (ii) re-date this Security Agreement if necessary in order to meet the requirements of any office where filing or registration is necessary to perfect, protect, or maintain the security interest created under this Security Agreement.

/ / /

/ / /

/ / /

**[CONTINUED]**

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327 Page 16

(f)     This Security Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which when taken together shall constitute one instrument.

The parties have caused this Security Agreement to be executed and delivered by their authorized officers as of the date first above written.

**PRODUCER:**     Shadowboxer, LLC.

By: _____

(signature)

Lee Daniels

(please type name)

Title: _____

Manager

(please insert title)


**SCREEN ACTORS GUILD, INC.**

By: _____

(signature)

Ron Bennett

(please type name)

Title: _____

Senior Manager

Theatrical and Television Contracts

(please insert title)

V3510 D327   Page 17

# EXHIBIT A
## TO SCREEN ACTORS GUILD, INC.
## THEATRICAL SECURITY AGREEMENT

### DEFINITIONS

"Debtor" as used in this Exhibit A means each Debtor identified in the foregoing Security Agreement and all persons who become bound as a debtor under this Security Agreement, the Code, or other applicable law.

(i)     "Accounts":  has the meaning ascribed to that term in the Code and include all receivables and all other rights to receive the payment of money including, but not limited to, the rights to receive the payment of money under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing, and other exploitation of the Picture, Rights in Product, the Literary Property, or any part thereof or any rights therein in any medium whether now known or hereafter developed by any means, method, process, or device in any market including, without limitation, all of Debtor's rights, title, and interest in, to, and under any distribution agreement relating to the Picture, as the same may from time to time be amended, reviewed, modified, supplemented, extended, or replaced including, but not limited to, Debtor's rights to receive film rentals, license fees, distribution fees, producer's shares, royalties, and other amounts of every description from:  (a) theatrical exhibitors, non-theatrical exhibitors, television networks and stations, airlines, cable television systems, pay television operators whether on a subscription or per program charge basis, distributors of the Picture by videotape, cassette, cartridge or disc, and other exhibitors; (b) other distributors, subdistributors, lessees, sublessees, licensees, and sublicensees (including any affiliate or subsidiary); and (c) any other person (including any affiliate or subsidiary) who distributes, exhibits, or exploits the Picture, Rights in Product, the Literary Property, or rights relating thereto.

(ii)     "Chattel Paper":  means all "chattel paper" as that term is defined in the Code, relating to the Picture.

(iii)     "Contracts":  mean all contracts of Debtor relating to the Picture including, without limitation: (a) all rights of Debtor to receive moneys due and to become due to it thereunder or in connection therewith; (b) all rights of Debtor to damages arising out of, or for, breach or default in respect thereof; and (c) all rights of Debtor to perform and to exercise all remedies thereunder.

(iv)     "Copyrights":  mean all copyrights, rights in copyrights, interests in copyrights, and all copyrightable tangibles or intangibles, now or hereafter existing, obtained upon the Picture or the Literary Property (as defined below) or any part thereof, in the United States or foreign territories, and all applications, registrations, and recordings relating thereto filed in the United States Copyright Office, or in any other government office or agency in the United States

or foreign territories, and the right, but not the obligation, to make publication thereof for copyright purposes, to register copyright claims, and the right, but not the obligation, to renew and extend such copyrights, and the right, but not the obligation, to sue in the name of copyright including, without limitation: (a) all rights of every kind and nature [including, but not limited to, Copyright(s)] in and to any literary, musical, dramatic, or other literary material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or which may be or has been used or included in the Picture including, but not limited to, all scripts, scenarios, teleplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts, or other properties or materials of any kind or nature in whatever state of completion, and all drafts, versions and variations thereof (collectively, the "Literary Property"); (b) the right to print, reprint, publish, reproduce, sell, distribute, perform, display, and make derivative works based on works presently or hereafter owned by or licensed to Debtor, in whole or in part, and all other rights which Debtor presently has or hereafter acquires pursuant to any Copyright License including, without limitation, copyright assignments, exclusive and nonexclusive licenses, and publishing agreements; and (c) all of Debtor's right, title, and interest in all physical materials embodying works with respect to which Debtor owns or holds rights in any copyrights including, without limitation, plates, films, color separations, and mechanical art.

(v)     "Copyright Licenses":  mean all of the following relating to the Picture: (a) any written agreement, naming Debtor as licensor or licensee, granting any right in and to any Copyrights or Copyright registration in the United States; or (b) all present and future agreements (including, without limitation, assignments and consents) as any such agreements may from time to time be amended or supplemented, under which Debtor now has or hereafter acquires any direct or beneficial interest in any Copyright, or is a grantor of rights to any third party with respect to any Copyright, whether as a party to any such agreement or as an assignee of any rights under any such agreement.

(vi)     "Documents":  mean all "documents" as that term is defined in the Code, relating to the Picture including, without limitation, documents and receipts of any kind or nature issued by any pledgeholder, warehouseman, or bailee relating to the Picture or any element thereof.

(vii)     "General Intangibles":  has the meaning ascribed to that term in the Code and include all general intangibles relating to the Picture including, without limitation, all literary property rights, patents and patent rights, trademarks, trade names, goodwill, inventions, processes, common law and statutory copyrights, music rights, rights in produced and unproduced screenplays and musical works, licenses, agreements, leases, royalties, franchises, Contracts, rights under Contracts (including rights under joint venture agreements), Chattel Paper, Documents, permits, negotiable and non-negotiable Instruments, judgments, deposit accounts, choses in action, and all general intangibles, whether or not included in the foregoing including, without limitation, shipping documents, warehouse receipts, policies of insurance, and other documents accompanying or relative to drafts drawn under any letter of credit and any such drafts.

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327    Page 19

(viii)   "Instruments": has the meaning ascribed to that term in the Code and include all cash and cash equivalents of Debtor derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange, and other writings relating to the Picture which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment.

(ix)   "Insurance and Insurance Policies": mean all insurance and insurance policies placed at any time upon the Picture, the insurable properties thereof, or any other insurable Collateral.

(x)   "Inventory": means all "inventory" as that term is defined in the Code, relating to the Picture including, without limitation, all inventory, merchandise, goods, and other personal property now or hereafter owned by Debtor which are held for sale or lease, are furnished or to be furnished under a contract of service, or which constitute raw materials, work in process, materials used or consumed or to be used or consumed in Debtor's business, the processing, packaging, delivery, or shipping of the same, and all finished goods.

(xi)   "Merchandising Rights": mean all collateral, allied, ancillary, subsidiary, publishing, and merchandising rights relating to the Picture including, but not limited to, rights derived from, appurtenant to or related to the Picture or the Literary Property including, but not limited to, all rights to use, exploit, and license others to use or exploit all novelization, publishing, commercial tie-up, and merchandising rights of every kind and nature (including, but not limited to, all novelization, publishing and merchandising rights, and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture, the Literary Property, or the names or characteristics of such characters).

(xii)   "Music Rights": mean all Debtor's rights presently owned or later acquired by Debtor in and to all music and musical compositions created for, used in, or to be used for the Picture, all related Copyrights and all rights to perform, copy, record, re-record, produce, publish, reproduce, or synchronize all music and musical compositions as well as all other rights to exploit such music including, but not limited to, record, soundtrack recording, and music publishing rights.

(xiii)   "Personal Property": means the following personal property of Debtor, wherever located, whether now owned or hereafter acquired: (a) the title or titles of the Picture and all of Debtor's rights to the exclusive use thereof (including, but not limited to, rights protected in accordance with trademark, service mark, unfair competition, or other laws, rules, or principles of law or equity); and (b) all inventions, processes, formulae, licenses, patents, patent rights, Trademarks, Trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, and other source identifiers relating to the Picture, and renewals and extensions thereof, domestic and foreign, whether now owned or hereafter acquired, and the accompanying goodwill and other like property rights relating to the Picture, and the right, but

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

V3510 D327   Page 20

not the obligation, to register claims under trademark or patent, and to renew and extend such trademarks or patents and the right, but not the obligation, to sue in the name of Debtor or in the name of the Guild for past, present, or future infringement of trademark or patent.

(xiv)   "Physical Properties":  mean all physical properties relating to the Picture and all versions thereof (including, but not limited to, all physical properties relating to the development, production, completion, delivery, exhibition, distribution, or other exploitation of the Picture, and all versions thereof or any part thereof including, but not limited to, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials including, but not limited to, interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised, soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims, and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations, and copies of each).

(xv)   "Proceeds":  has the meaning ascribed to that term in the Code and include any proceeds relating to the Picture including, without limitation:  (a) all proceeds of any insurance, indemnity, warranty, or guaranty payable from time to time with respect to any of the Collateral; (b) all payments (in any form) made or due and payable from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of any of the Collateral by any governmental body, authority, bureau, or agency (or any person acting under color of governmental authority); and (c) all other amounts from time to time paid or payable in connection with any of the Collateral.

(xvi)   "Product":  means the Picture, whether produced for theatrical, non-theatrical, television release, or for release in any other medium, whether recorded on film, videotape, cassette, cartridge, disc, or on or by any other means, method, process, or device whether now known or hereafter developed, with respect to which Debtor has, acquires, or agrees to acquire all or part of the theatrical, videotape, cassette, disc, or television distribution rights.

(xvii)   "Rights in Product":  mean all of the following:  (a) any rights, whether arising under written contracts or otherwise, to sell, produce, distribute, exhibit, lease, sublease, license, sublicense, subdistribute, or otherwise exploit Product including, without limitation, rights under so-called "pick up" arrangements and other contracts and agreements relating to the acquisition of Product or any interest therein in any market including, without limitation, theatrical, non-theatrical, stage, television (including broadcast, cable, and pay television) and home markets, whether by film, videotape, cassette, cartridge, disc, or by any other means, method, process or device now known or hereafter developed; (b) any rights to sell trailers and advertising accessories relating to Product; and (c) any rights to exploit any element or component of Product or any ancillary rights relating to Product including, without limitation, merchandising and character rights, stage rights, novelization rights, sound track recording rights, and music

V3510 D327   Page 21

SAG Security Agreement (Theatrical-Standard)
11640.3000
(Rev.06.12.02)

publishing rights relating to any music embodied in or written for Product including the right to grant licenses to print, perform, or mechanically reproduce such music.

(xviii) "Trademarks": mean all of the following created specifically for, or included in, the Picture: (a) service marks, logos, and other source identifiers and the goodwill associated therewith, now existing or hereafter adopted or acquired; (b) all registrations and recordings thereof, and all applications in connection therewith owned by Debtor, relating to the Picture, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise; and (c) all renewals thereof.

(xix) "Trademark Licenses": mean all agreements relating to the Picture providing for the grant to Debtor of any right to use any Trademark.

**"EXHIBIT C"**

Guaranty-Theatrical

## GUARANTY AGREEMENT

THIS AGREEMENT AND UNCONDITIONAL GUARANTY (the "Guaranty") is hereby made by **Lee Daniels Entertainment, Ltd.,** ("Guarantor") for the benefit of the **Screen Actors Guild, Inc.** ("SAG" or "Guild"), in order to guarantee the performance by **Shadowboxer, LLC** (hereinafter, "Producer") of all terms and obligations under the **Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, as amended by the 1998 Memorandum of Agreement, the 2001 Memorandum of Agreement,** and any and all amendments thereto and replacements therefor (hereinafter, "Basic Agreement") relating to the motion picture entitled **"Shadowboxer"** (the "Picture") including, but not limited to, the following obligations:

(a)       to pay Guild-represented employees employed in the Picture ("Performers") the agreed compensation for services performed due under the Basic Agreement or pursuant to any personal services agreement and/or deal memorandum;

(b)       to pay additional compensation required under the Basic Agreement which becomes due to such Performers when the Picture is distributed, exhibited, or otherwise exploited  (hereinafter "Residuals");

(c)       to obtain from any distributor of the Picture a Distributor's Assumption Agreement and deliver same to the Guild;

(d)       to pay pension, health and welfare contributions for the benefit of the Performers employed in the making of the Picture; and

(e)       to satisfy any arbitration award obtained against Producer relating to the Picture pursuant to the applicable provision of the Basic Agreement.

Guarantor acknowledges that it has received a copy of the Basic Agreement and is familiar with its terms and requirements.

In consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Guarantor hereby agrees as follows:

1.       Guarantor unconditionally guarantees as of the date of this Agreement that Producer will keep and perform, or that Guarantor will instead perform upon SAG's request, each and all of its obligations to SAG and the Screen Actors Guild-Producers Pension and Health Plans (the "Plans") pursuant to the Basic Agreement (collectively, the "Obligations") with respect to the Picture.

2.       It is expressly understood that the right of Guarantor or Producer to telecast such motion picture and exhibit the same theatrically and in Supplemental Markets, shall be subject to and conditioned upon the prompt payment of Residuals, in accordance with the

SAG Guaranty Agreement
Re: "          " (        )
(Prep  8.19.1997)

Basic Agreement. Guarantor further agrees that SAG and the Plans shall be entitled to injunctive relief against Guarantor and/or Producer in the event that such payments are not made.

3.     This Guaranty is a continuing guaranty binding upon the Guarantor and its successors and assigns, and inuring to the benefit of, and enforceable by, SAG and its successors and assigns. The obligations of Guarantor hereunder shall not be discharged, affected, impaired or released by any insolvency, bankruptcy, reorganization, merger affiliation, liquidation, dissolution or similar proceeding.

4.     In addition to obligations imposed upon Producer with respect to the sale, assignment or other transfer of the Picture under the Basic Agreement, Guarantor agrees that in the event of any sale, assignment, or other transfer of any interest in the Picture, Guarantor shall require any such purchaser, assignee, or transferee as a condition of any such transfer to (a) accept, by written contract satisfactory to SAG, the terms of this Guaranty and assume all of Guarantor's obligations hereunder; (b) grant SAG a first priority security in the Picture, rights therein and the proceeds thereof to secure the obligations hereunder, and to execute a UCC-1 Financing Statement, Security Agreement and a Copyright Mortgage ("Security Interest Documents") in SAG's favor confirming such grant of a security interest to SAG, and (c) to deliver said agreement of assumption and Security Interest Documents to SAG prior to concluding any such sale, assignment, or transfer. Upon delivery of such documents and on condition that SAG approve in writing the financial responsibility of the purchaser, assignee, or transferee, Guarantor shall not be further liable for Guarantor's obligations hereunder. Such approval shall not be unreasonably withheld.

5.     Guarantor waives presentation to, demand for, payment from, and protest to Producer of any of the obligations, and also waives notice of protest for non-payment or other non-satisfaction. The obligations of Guarantor hereunder shall not be discharged, impaired or affected by (i) the failure of SAG to assert any claim or demand or to enforce any right or remedy against Producer under the provisions of the Basic Agreement; (ii) an extension or renewal of the Basic Agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of the Basic Agreement other than by mutual agreement of Producer and SAG; or (iv) any default, failure or delay, willful or otherwise, by Producer in the performance of any or all of the Obligations, or by any other act or omission or delay by Producer which may or might in any manner or to any extent vary the risk of Guarantor or would otherwise operate as a discharge or a limitation of the liability of Guarantor as a matter of law or agreement; provided, however, that notwithstanding anything else contained in this Guaranty Agreement, Guarantor shall have any and all rights possessed by Producer pursuant to the Basic Agreement or any extensions, modifications, renewals, rescissions, waivers or amendments thereof. Any written notices concerning the non-payment or other non-satisfaction of any obligation under the Basic Agreement sent by SAG to Producer with respect to the Picture shall also be delivered to Guarantor in the manner set forth below in paragraph 11.

6.     If any provision of this Guaranty Agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable, the remaining provisions of this Guaranty Agreement shall nevertheless remain in full force and effect.

7.        The parties agree to cooperate with each other and take all further actions as may from time to time be reasonably necessary to carry out the purposes of this Guaranty Agreement.

8.        Each party agrees that all disputes based upon, arising out of or relating in any way directly or indirectly to, this Guaranty Agreement shall be submitted to arbitration in accordance with the arbitration provisions of the SAG Basic Agreement and any amendment thereto. Guarantor further agrees that the arbitrator's authority shall include, but is not limited to, issuance of injunctive relief, provided that nothing herein shall limit any legal or equitable rights or remedies available to SAG or the Plans. Notwithstanding the foregoing, Guarantor agrees and acknowledges that SAG is not precluded by this or any other provision of this Guaranty from obtaining injunctive relief at any time prior to arbitration or issuance of an arbitration award.

9.        This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the principles of conflicts of law.

10.       Further, each party agrees that any legal action or proceeding to execute or otherwise enforce any judgment or arbitration award obtained against Guarantor or Producer or any of their properties may, at the Guild's option, be brought in proceedings in the Federal or State courts located in the State of California, and in addition, the Guild in its sole discretion may bring suit in the courts of any country or place where employer or any of its assets may be found and, by execution and delivery of this Guaranty, Guarantor irrevocably submits to such jurisdiction and consents to the service of process in any such action or proceeding by personal delivery, first class mail, or any other method permitted by law.

11)       All notices requests, demands, or other communications required or permitted pursuant to this Guaranty shall be in writing and must be (a) given by personal delivery, (b) sent by registered mail, postage prepaid, return receipt requested, or (c) sent by telecopy with a copy by mail, addressed to the party to receive the Notice at the following address or to such other address as a party hereto may hereafter specify pursuant to this paragraph. Notice will be deemed to have been duly given or made (a) immediately upon personal delivery or (b) five (5) days from the date of mailing within the United States of America or seven (7) days from the date of mailing across national borders.

To Guarantor:        _____
                     _____
                     _____
Attention:           _____
Telecopier:          _____


With courtesy
copy to:             _____
                     _____
Attention:           _____
Telecopier:          _____

2622.1

- 3 -

To SAG:       5757 Wilshire Boulevard
              Los Angeles, CA  90036
Attention:    Vicki G. Shapiro
Telecopier:   (323) 549-6626

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its name as of
_____.

By:_____
    Authorized Officer

____Lee Daniels_____
(Please type in name)

– 4 –

**"EXHIBIT D "**

# PRODUCER-
# SCREEN ACTORS GUILD
# CODIFIED BASIC AGREEMENT
# OF 1995

## TERM: JULY 1, 1995 - JUNE 30, 1998



**ALLIANCE OF
MOTION PICTURE
AND TELEVISION
PRODUCERS**
15503 Ventura Boulevard
Encino, CA 91436
(818) 995-3600

## GENERAL PROVISIONS

### Table of Contents

| Section No. | | Page No. |
|---|---|---|
| 1. | Recognition and Scope of Agreement..................... | 1 |
| 2. | Union Security........................................ | 2 |
| 3. | Strikes.............................................. | 5 |
| 4. | Theatrical Motion Pictures, the Principal Photography of which Commenced between January 31, 1960 and July 21, 1980 Released to Free Television.......... | 7 |
| 5. | Television Exhibition of Theatrical Motion Pictures, the Principal Photography of which Commenced After October 6, 1980............................................ | 7 |
| 5.1 | Supplemental Markets Exhibition of Theatrical Motion Pictures, the Principal Photography of which Commenced After June 30, 1971 but prior to July 21, 1980...... | 14 |
| 5.2 | Supplemental Markets Exhibition of Theatrical Motion Pictures, the Principal Photography of which Commenced after October 6, 1980........................................ | 15 |
| 5.3 | Copyright Royalty Tribunal............................. | 26 |
| 6. | Responsibility for Payments............................ | 26 |
| 6.1 | Residuals Audits...................................... | 45 |
| 7. | Theatrical Motion Pictures, the Principal Photography of which Commenced Prior to February 1, 1960.......... | 46 |
| 8. | Original Employment – Pay Television, Videodisc/Videocassette Markets......................................... | 47 |
| 9. | Arbitration.......................................... | 47 |
| 10. | Newsreels, Travelogues, Narrations, Etc................ | 52 |
| 11. | Agreement and Schedules Incorporated in Performer's Contract -- Waivers................................... | 52 |
| 12. | Better Terms and Conditions........................... | 55 |
| 13. | Undirected Scenes – Public Events...................... | 55 |
| 14. | Preference of Employment.............................. | 56 |
| 15. | Application to Existing Contracts...................... | 60 |
| 16. | Contracts Delivered on Set............................ | 60 |
| 17. | Industry-Union Cooperative Committee................... | 60 |
| 18. | Trailers and Promotional Films........................ | 62 |
| 19. | Furnishing Reports................................... | 64 |
| 20. | Prohibition Against Crediting.......................... | 64 |
| 21. | Dressing Rooms and Other Facilities.................... | 64 |
| 22. | Reuse of Photography or Sound Track.................... | 65 |
| 23. | Air Travel and Flight Insurance....................... | 69 |
| 24. | Independent Production................................ | 70 |
| 25. | Screen Credits....................................... | 70 |
| 26. | Non-Discrimination................................... | 72 |
| 27. | Tours and Personal Appearances........................ | 78 |
| 28. | Injuries to Persons or Property During Performance; Safety............................................... | 78 |
| 29. | Loan-Outs............................................ | 83 |
| 30. | Production Staff...................................... | 83 |
| 31. | Production Time Reports, Late Payments, Overwithholding and Payroll and Unemployment Insurance Information........................................... | 84 |

- i -

| Section No. | | Page No. |
|---|---|---|
| 32. | Industry Advancement and Cooperative Fund | 86 |
| 33. | Subcontracting | 86 |
| 34. | Pension and Health Plans | 86 |
| 35. | Additional Provisions | 92 |
| 36. | Term and Effective Date | 93 |
| 37. | Union's Articles and By-Laws | 95 |
| 38. | Separate Agreement as to Each Producer | 95 |
| 39. | Other Producers May Become Parties | 95 |
| 40. | Purposes of Codification – Saving Clause – Title | 95 |
| 41. | Rules of Construction | 96 |
| 42. | Service of Notices | 96 |
| 43. | Nudity | 96 |
| 44. | Humane Treatment of Animals – Statement of Policy | 97 |
| 45. | Videotape | 98 |
| 46. | Verification of Television Runs – Coding | 98 |
| 47. | Casting | 98 |
| 48. | Favored Nations Clause | 98 |
| 49. | Photography of Stage Performance (Instant Movies) | 98 |
| 50. | Employment of Minors | 99 |
| 51. | Alcoholism and Drug Abuse Program | 106 |
| 52. | Translation | 106 |
| 53. | Temporary Employment – Non-Resident Alien Performers | 106 |
| 54. | Definition of Network | 106 |
| 55. | Stunt Coordinators | 106 |
| 56. | Body Doubles | 107 |
| 57. | Dubbing | 107 |
| 58. | Work in Smoke | 107 |

EXHIBIT A – Companies in Multi-Employer Unit Represented
by the Alliance of Motion Picture & Television Producers

EXHIBIT B – Casting Data (Performers Other Than Stunt
Performers)

EXHIBIT B-1 – Casting Data (Stunt Performers Only)

Sideletter 1   re Payroll Data
Sideletter 2   re Affirmative Action –
                  Non-Discrimination
Sideletter 3   re Employment of Minors
Sideletter 4   re National Safety Board
Sideletter 5   re Other than Network Prime Time
                  Dramatic Programs
Sideletter 6   re Product Made for Pay Television
                  Videodisc/Videocassette Markets
Sideletter 7   re Stunt Coordinators and Insurance
Sideletter 8   re Contract Interpretations
Sideletter 9   re Identification of Parties
Sideletter 10  re Reservation of Positions
Sideletter 11  re Situs of Arbitration Hearings

| Section No. | | Page No. |
|---|---|---|
| | Sideletter 12 re Dialogue Replacement Work | |
| | Sideletter 13 re "Distributor" | |
| | Sideletter 14 re Rehearsal | |
| | Sideletter 15 re Section 39 | |
| | Sideletter 16 re Puppeteers | |
| | Sideletter 17 re Stunt Coordinators; Reuse of Stunt Footage | |
| | Sideletter 18 re Stunt Coordinators; Staffing | |
| Schedule A: | DAY PERFORMERS............................ | 109 |
| Schedule B: | TELEVISION FREELANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS $4,000 OR LESS PER WEEK AND WHO ARE GUARANTEED LESS THAN $28,500 PER TELEVISION PICTURE AND THEATRICAL FREELANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS $4,500 OR LESS PER WEEK AND WHO ARE GUARANTEED LESS THAN $45,000 PER THEATRICAL PICTURE.............. | 148 |
| Schedule C: | TELEVISION FREELANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS MORE THAN $4,000 PER WEEK AND WHO ARE GUARANTEED LESS THAN $28,500 PER TELEVISION PICTURE AND THEATRICAL FREELANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS MORE THAN $4,500 PER WEEK AND WHO ARE GUARANTEED LESS THAN $45,000 PER THEATRICAL PICTURE.................................... | 198 |
| Schedule D: | MULTIPLE PICTURE PERFORMERS RECEIVING $4,000 OR LESS PER WEEK AND GUARANTEED LESS THAN $28,000 PER TELEVISION PICTURE OR RECEIVING $4,500 OR LESS PER WEEK AND GUARANTEED LESS THAN $45,000 PER THEATRICAL PICTURE.................................... | 244 |
| Schedule E: | CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS $4,000 OR LESS PER WEEK FOR TELEVISION MOTION PICTURES OR WHOSE WEEKLY GUARANTEED SALARY IS $4,500 OR LESS PER WEEK FOR THEATRICAL MOTION PICTURES.............. | 247 |

- iii -

| Section No. | | Page No. |
|---|---|---|

**Schedule F:** CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS IN EXCESS OF $4,000 PER WEEK FOR TELEVISION MOTION PICTURES OR IN EXCESS OF $4,500 PER WEEK FOR THEATRICAL MOTION PICTURES; MULTIPLE PICTURE PERFORMERS RECEIVING MORE THAN $4,000 PER WEEK OR WHO ARE GUARANTEED $28,500 OR MORE PER TELEVISION PICTURE OR RECEIVING MORE THAN $4,500 PER WEEK OR WHO ARE GUARANTEED $45,000 OR MORE PER THEATRICAL MOTION PICTURE; PERFORMERS EMPLOYED UNDER "DEAL CONTRACTS," OR OTHERWISE, WHO ARE GUARANTEED $28,500 OR MORE PER TELEVISION PICTURE OR WHO ARE GUARANTEED $45,000 OR MORE PER THEATRICAL MOTION PICTURE; PERFORMERS EMPLOYED IN MULTI-PART CLOSED-END PICTURES RECEIVING MORE THAN $4,000 PER WEEK AND WHO ARE GUARANTEED $34,000 OR MORE FOR THE MULTI-PART PICTURE...................... 289

**Schedule G-I:** PROFESSIONAL SINGERS EMPLOYED BY THE DAY.... 321

**Schedule G-II:** PROFESSIONAL SINGERS EMPLOYER BY THE WEEK ON TELEVISION MOTION PICTURES AT $4,000 OR LESS PER WEEK AND PROFESSIONAL SINGERS EMPLOYED BY THE WEEK ON THEATRICAL MOTION PICTURES AT $4,500 OR LESS PER WEEK...................... 332

**Schedule H, Part I** STUNT PERFORMERS EMPLOYED BY THE DAY........ 345

    **EXHIBIT C:** STUNT PERFORMER'S TELEVISION MOTION PICTURE DAILY CONTRACT

    **EXHIBIT C-1:** STUNT PERFORMER'S THEATRICAL MOTION PICTURE DAILY CONTRACT

**Schedule H, Part II:** STUNT PERFORMERS EMPLOYED BY THE WEEK ON TELEVISION MOTION PICTURES AT $4,000 OR LESS PER WEEK AND STUNT PERFORMERS EMPLOYED BY THE WEEK ON THEATRICAL MOTION PICTURES AT $4,500 OR LESS PER WEEK...................... 356

    **EXHIBIT D:** STUNT PERFORMER'S TELEVISION MOTION PICTURE MINIMUM FREELANCE WEEKLY CONTRACT

    **EXHIBIT D-1:** STUNT PERFORMER'S MINIMUM FREE-LANCE WEEKLY CONTRACT FOR THEATRICAL MOTION PICTURES

**Schedule H, Part III:** STUNT PERFORMERS EMPLOYED BY THE WEEK ON TELEVISION MOTION PICTURES AT MORE THAN $4,000 PER WEEK AND STUNT PERFORMERS EMPLOYED BY THE WEEK ON THEATRICAL MOTION PICTURES AT MORE THAN $4,500 PER WEEK.................. 365

- iv -

| Section No. | | Page No. |
|---|---|---|
| Schedule H, Part IV: | STUNT PERFORMERS EMPLOYED UNDER TERM CONTRACTS........................................ | 374 |
| Schedule I: | AIRPLANE PILOTS............................. | 378 |
| Schedule J: | DANCERS EMPLOYED ON THEATRICAL MOTION PICTURES.................................. | 384 |
| Schedule K, Part I | STUNT COORDINATORS EMPLOYED BY THE DAY AT LESS THAN THE "FLAT DEAL" MINIMUM.......... | 388 |
| Schedule K, Part II | STUNT COORDINATORS EMPLOYED BY THE WEEK AT LESS THAN THE "FLAT DEAL" MINIMUM.......... | 408 |
| Schedule K, Part III | STUNT COORDINATORS EMPLOYED UNDER "FLAT DEAL" CONTRACTS............................ | 438 |
| Schedule X Part I: | EXTRA PERFORMERS EMPLOYED IN THE LOS ANGELES, SAN DIEGO, SAN FRANCISCO, HAWAII AND LAS VEGAS ZONES..................................... | 442 |
| | EXHIBIT E (Studio Zone Map)................. | 498 |
| | EXHIBIT F (L.A. Extra Zone - Map).......... | 499 |
| | EXHIBIT G (San Francisco Extra Zone - Map).. | 500 |
| | Sideletter 1  re Florida Zone.............. | 501 |
| | Sideletter 2  re Exclusion of Assistant Choreographers From Definition of Section 3.... | 502 |
| | Sideletter 3  re "Wet Mud Work" and Extra Performers Wearing Clothing Not Suited to Climatic Extremes................... | 503 |
| Schedule X Part II: | EXTRA PERFORMERS EMPLOYED ON MOTION PICTURES BASED IN NEW YORK AND IN THE NEW YORK EXTRA ZONES..................................... | 504 |
| | Sideletter 1  Exclusion of Assistant Choreographers from Definition of Section 3....... | 560 |
| | Sideletter 2  Continued Use of Qualified Hairdressers and Stylists..... | 561 |
| | Sideletter 3  "Wet Mud Work" and Extra Players Wearing Clothing Not Suited to Climatic Extremes... | 562 |
| | Sideletter 4  Meal Periods.................. | 563 |
| | Sideletter 5  Policy on Counting "No-Shows" Toward Applicable Crowd Numbers..................... | 564 |
| | EXHIBIT H................................. | 565 |

- v -

from the Producer affected thereby, shall proclaim promptly and publicly that such strike, slowdown or work stoppage is unauthorized and follows such pronouncement within a reasonable time thereafter, if requested so to do by the Producer affected, with disciplinary proceedings in accordance with its by-laws against the participants in such unauthorized action.

4.   **THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED BETWEEN JANUARY 31, 1960 AND JULY 21, 1980 RELEASED TO FREE TELEVISION**

Theatrical motion pictures produced under a prior Producer-Screen Actors Guild Codified Basic Agreement, the principal photography of which commenced between January 31, 1960 and July 21, 1980 and which are released to free television, shall be governed by the provisions relating to additional compensation payable to performers for exhibition of theatrical motion pictures on free television of the applicable Codified Basic Agreement under which such pictures were produced.

5.   **TELEVISION EXHIBITION OF THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED AFTER OCTOBER 6, 1980\***

A.   With respect to theatrical motion pictures, the principal photography of which commenced after October 6, 1980 and released to free television anywhere in the world, Producer agrees to pay to SAG a deferred compensation, for rateable distribution to the performers appearing in such pictures, equal to six percent (6%) of the worldwide total gross receipts from the distribution of such pictures on free television, after deducting a flat amount of forty percent (40%) of such total gross receipts for distribution fees and expenses.  Said compensation shall include pension and health contributions.  Such pension and health contributions shall be at the rate provided in and subject to the ceiling and other provisions of Section 34 hereof or of the "Pension and Health Plans" provision of the Agreement under which such picture was produced, whichever is applicable.

When the Producer does not itself so distribute such picture, but effects its distribution through another distributor, the percentage paid shall be based on such distributor's gross receipts from such distribution of such picture on free television, after deducting said flat amount of forty percent (40%) from such total gross receipts, payable only after they are received by the Producer, and after such forty percent (40%)

---

\*The Screen Actors Guild was on strike against the Producers during the period July 22, 1980 through and including October 5, 1980.  The terms of an interim agreement may be applicable to performers who were employed in motion pictures produced during that period.

-7-

deduction.  When Producer is paid advances by a distributor, the above percentage shall likewise be payable on the amount of such advances.  When Producer sells outright the right to exhibit on free television, SAG shall be paid promptly the above percentage on the gross amounts actually received by Producer for such free television exhibition rights, after deducting a flat amount of ten percent (10%) of such gross amounts so received by Producer from such outright sale of free television exhibition rights, for sales commission and expenses of sale.

If any such outright sale shall include both free television exhibition rights and other rights with respect to one or more pictures, the Producer shall allocate, to the free television exhibition rights covered by such sale, a fair and reasonable portion of the sale price (but only for the purpose of determining the percentage payment due hereunder) based on the sale of free television exhibition rights in comparable pictures.  If SAG shall contend that the amount so allocated in any such outright sale for free television exhibition rights was not fair and reasonable as aforesaid, then such claim shall be submitted to arbitration as herein provided.  In the event the arbitrator shall find that such allocation was not reasonable and fair as aforesaid, he shall determine the fair and reasonable amount to be so allocated.  When the sale is of the free television exhibition rights only in a group of pictures, Producer shall likewise make an allocation of a portion of the sale price to each picture.  If SAG contends that allocation is not fair and reasonable, the matter may be similarly submitted to arbitration, as above provided.  In the event the arbitrator shall find that such allocation was not reasonable and fair, as aforesaid, he shall determine the fair and reasonable amount to be so allocated.

The provisions of the preceding paragraph shall not apply to any sale of free television exhibition rights only in a single picture.

The term "performer" means those persons covered by this Agreement and includes performers, professional singers, stunt performers, airplane and helicopter pilots, dancers*, stunt coordinators** and puppeteers, but excludes body doubles.

---

*   Only dancers employed under Schedule J of this Agreement are entitled to participate in the monies payable pursuant to this Section.

**  Stunt coordinators employed under this Agreement are entitled to participate in the monies payable pursuant to this Section.  All compensation paid for stunt coordinating services and any other services covered by the Agreement shall be combined in calculating salary units under subsection B.(2) hereof.

-8-

B.   Distribution Formula

The amount received by Screen Actors Guild under the formula set forth in Paragraph A. above shall be distributed as follows:

Units will be assigned to performers entitled to participate as follows:

(1)   Time Units

With respect to each performer, units for time worked shall be computed as follows:

Each day  = one-fifth (1/5) unit
Each week = one (1) unit

No more than five (5) time units may be credited to any performer.

(2)   Salary Units

With respect to each performer, units for total compensation received from the film shall be credited as follows:

(a)   Day Performer:  Each multiple of daily scale equals one-fifth (1/5) unit.  A fraction of daily scale, when more than one-half (1/2), shall be credited as another one-fifth (1/5) unit.

(b)   All Other Performers:  Each multiple of weekly scale equals one (1) unit.  A fraction of a multiple, when more than one-half (1/2) of weekly scale, shall be credited as another weekly unit.

(c)   No more than ten (10) salary units may be credited to any performer.

(3)   Computation

Each performer shall be credited with the sum of time and salary units as computed above, and each performer will receive that rateable proportion of the monies as the performer's number of units bears to the total number of units for the entire cast.

C.   With respect to such pictures made outside of the United States, when part of the cast is composed of performers subject to this Agreement and part of the cast of performers is not subject to this Agreement, then sums payable hereunder shall be prorated based on the proportion which the salaries and the time worked payable to the performers subject to this Agreement bear to the total performers' salaries and time worked for the picture.  If records reflecting time worked are not reasonably available, then the aforementioned proration may be based on salaries alone.

-9-

### D.   Application to Pictures Initially Released Theatrically

The provisions of this Section 5 regarding additional compensation for free television exhibition apply only to a theatrical motion picture which is exhibited on free television after it has had a *bona fide* theatrical release.  Such motion picture exhibited on free television that has not had a *bona fide* theatrical release shall be governed by the Screen Actors Guild Television Agreement then in effect, but only with respect to the provisions relating to additional compensation for reruns and foreign telecasts, or as may otherwise be agreed upon between the Producer and the Union.

The provisions of this Section 5 shall not apply to the televising of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, subject to the limitations provided in Section 18 hereof.

### E.   Time and Method of Payments

With respect to the initial payment due hereunder for network television exhibition, such payment shall be due and payable within thirty (30) days after the initial broadcast of such motion picture on a network.

With respect to the initial payment due hereunder for television exhibition, other than network television, such payment shall be due and payable within four (4) months after the initial broadcast of such motion picture on free television other than network television.

All such payments hereunder shall be made by check, payable to the order of the performer entitled thereto, and delivered to the Union for forwarding to such performer.  Producer shall make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation provided for in this Section 5.  Compliance herewith shall constitute payment to the performer.

### (1)   Network

With respect to network television exhibition, in the event Producer shall fail to pay such additional compensation when and as the same becomes due and payable, the Producer shall pay a late payment charge in the amount provided in Section 31.B. hereof until such additional compensation is paid.

### (2)   Syndication and Foreign Telecasting

With respect to syndication and foreign telecasting, in the event Producer fails to pay such additional compensation within ten (10) days from the date of a notice in writing to Producer from the Union, a late payment penalty shall accrue at the rate of one percent (1%) per month from the date of such notice; however, in no event shall the total late payment penalty

-10-

with respect to any performer exceed one hundred percent (100%) of the amount owing to such performer.

As used herein, the term "network exhibition" shall mean the telecasting of such picture over the network facilities in the United States of NBC, CBS or ABC, or any other entity which qualifies as a network under Section 73.662(f) of the rules of the Federal Communications Commission, unless the FCC determines that such entity is not a network for purposes of such Section.   A motion picture shall not be deemed telecast over a television network when it is telecast (i) on any single regional network presently established and (ii) when it is telecast on any single regional network which may hereafter be established and which does not include New York, Chicago or Los Angeles.

(3)   The foregoing provisions shall not preclude the Producer from recovering an erroneous payment.  If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, or if there is a *bona fide* dispute as to the Producer's liability therefor, there will be no late payment charge during the pendency of the dispute.

F.   Effect of Performer's Individual Contract

When compensation is payable to any performer in connection with any such picture released to free television, pursuant to an individual contract between such performer and Producer, and such compensation is based, in whole or in part, upon a percentage of Producer's gross receipts, then such percentage compensation may be credited against such performer's share of the monies payable by Producer to SAG hereunder or, on the other hand, such performer's share of the monies payable hereunder may be credited against the percentage compensation due under the performer's personal service contract, depending upon which such payment was made first.  Notwithstanding the foregoing, any compensation payable to such performer under an individual contract under which such compensation is a specified sum of money commonly known as a "deferment," as distinguished from a participation in the gross of a picture, may not be credited against the monies payable by Producer to SAG hereunder.

G.   Reporting

Producer shall furnish to the Guild with respect to each motion picture produced covered under this Section 5, a complete cast list of actors covered by this Agreement including the name of each actor, Social Security number, type of employment contract, length of employment and the payments for free television exhibition which will become payable to or for the account of each actor with respect to such motion picture.  Such cast list shall be furnished to the Guild 120 days after completion of principal photography or 90 days after completion of each such motion picture, whichever is sooner.  Producer will thereafter furnish a revised or final list when necessary.

-11-

Producer shall furnish to SAG written reports showing the gross receipts from the sale, lease, license and distribution of such picture on free television (whether distributed by the Producer or through another distributor) with respect to which the Producer is required to make payments hereunder. Such reports shall be furnished at least quarterly during each calendar year, except in the case of an outright sale. No such report need be furnished by Producer as to any such picture until such Producer shall have first exhibited such picture on free television. Concurrently with the furnishing of such report, the Producer shall pay the percentages due. Producer shall also make available for inspection by SAG all distributors' statements delivered to Producer, insofar as they relate to such gross receipts. SAG shall have the right, at reasonable times, to examine the books and records of Producer as to such gross receipts pertaining to such distribution of such pictures. Producer also agrees that any agreement entered into by it for the lease, license or distribution of any such pictures on free television shall contain a provision made expressly for the benefit of SAG and the performers involved in such pictures, by which such lessee, licensee or distributor agrees to assume and pay the percentage amounts payable hereunder to SAG when and as the same become due; and copies of all such provisions contained in such agreements, with a statement of the name and address of the Producer and the lessee, licensee or distributor and the date of execution shall be delivered to SAG promptly upon the execution thereof. In the event any lessee, licensee or distributor executes such assumption agreement and a copy thereof is delivered to SAG as above provided, Producer shall be relieved of any further obligation or liability with respect to such payment on condition that SAG has approved, in writing, the financial responsibility of such lessee, licensee or distributor.

An inadvertent failure to comply with the reporting provisions of this Section 5 shall not constitute a default by Producer hereunder, provided said failure is cured promptly after notice thereof from the Screen Actors Guild is received by Producer. Producer hereby authorizes television stations to make available to representatives of the Guild their station logs to verify the station plays of theatrical motion pictures. Regarding a possible system of coding product which appears on television, a joint Producer-Guild Committee will be established to consider any workable system when it is available, and such committee shall investigate and make recommendations, which will be given consideration by the Producers.

H.   Advances

A "non-returnable advance" is to be included in "worldwide total gross receipts" when a theatrical motion picture is "available" and "identifiable" and the amount of the advance payment is "ascertainable."

-12-

(1)  Such theatrical motion picture is "available" when the first of the following occurs:

(a)  The product first may be exhibited or otherwise exploited by a specified method of distribution and in a territory under the terms of the applicable license or distribution agreement, or

(b)  It first may be sold or rented by a retailer under the terms of the applicable license or distribution agreement.

(2)  Such theatrical motion picture is "identifiable" when the Producer first knows or reasonably should have known that a given motion picture is covered by a particular license or distribution agreement for its exploitation in the applicable market.

(3)  The amount of the advance payment is "ascertainable" if:

(a)  the advance is for one theatrical motion picture, means of exhibition, and territory, or

(b)  the total amount of the advance is for more than one motion picture, means of exhibition and/or territory, in which case the Producer shall fairly and reasonably allocate such advance among the licensed motion pictures, exhibition markets and/or territorial markets.  As each of these pictures becomes identifiable and available, the allocated portion of the nonreturnable advance is to be included in the "worldwide total gross receipts" for that quarter.  The Producer shall notify the Guild of its allocation when the report of "worldwide total gross receipts" which includes the advance, is to be filed.  The Guild has the right to challenge in an arbitration a failure to allocate or any allocation that it contends is not fair and reasonable.

If such theatrical motion picture is available in any territory or by any means of exhibition, and is identifiable and the amount of the advance is ascertainable, but the Producer does not provide the Guild with the information required by this Agreement and applicable law, then the advance shall be deemed includable in "worldwide total gross receipts" no later than six (6) months after the Producer receives it.

An advance received by a Producer's parent, subsidiary or any other related or affiliated entity or successor-in-interest, or by any other entity to which the advance payment is directed by the Producer or license or distribution agreement, shall be considered as an advance payment received by the Producer.

-13-

I.   Favored Union Clause

If, during the term of this Agreement, any union, through its collective bargaining agreement negotiated with the Producers, obtains an increase in its present percentage "participation of the gross" for television exhibition of theatrical motion pictures, then, in such event, the Union will be entitled to a comparable increase in the rates provided for in this Section.

J.   Release Without Exhibition

In the event the Producer actually receives payment for the release of a theatrical motion picture hereunder for exhibition on free television, the applicable fees provided hereunder shall be payable whether or not such motion picture is in fact exhibited on free television.   This provision shall not apply in the case of a license of films when a picture is "dropped out" of such license.

K.   SAG shall not be entitled to payments hereunder with respect to blocked foreign revenue except by transfer of blocked funds and then only if permission for such transfer can be obtained by SAG from local fiscal authorities.   Blocked funds shall be deemed to be unblocked on the basis of "first in, first out," unless allocated to specific periods by local fiscal authorities.   Allocation of unblocked funds, as between the revenue due hereunder and other revenue, shall be on a proportional basis, subject to different earmarking by local fiscal authorities.   Accounting shall be on the basis of net funds remitted or converted to exportable properties.   Producer shall not be responsible for losses of blocked revenue resulting from matters beyond its control.

L.   The references herein to payment to SAG shall mean payments to SAG for rateable distribution to the performers involved.

**5.1   SUPPLEMENTAL MARKETS EXHIBITION OF THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED AFTER JUNE 30, 1971 BUT PRIOR TO JULY 21, 1980**

Theatrical motion pictures produced under a prior Producer-Screen Actors Guild Codified Basic Agreement, the principal photography of which commenced after June 30, 1971 but prior to July 21, 1980, which are released by Producer for exhibition in Supplemental Markets anywhere in the world, shall be governed by the provisions relating to additional compensation payable to performers for exhibition of theatrical motion pictures in Supplemental Markets of the applicable Codified Basic Agreement under which such pictures were produced.   However, the provisions

-14-

of subsection D. of Section 5.2 of this Agreement, relating to
the definition of "Supplemental Markets," and the provisions of
subsection E. of Section 5.2 of this Agreement, relating to the
definition of "Distributor's gross receipts" derived from release
of such motion pictures in Supplemental Markets, shall apply to
such pictures.

**5.2   SUPPLEMENTAL MARKETS EXHIBITION OF THEATRICAL MOTION
     PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED
     AFTER OCTOBER 6, 1980***

   A.   Schedule of Payments

      With respect to each theatrical motion picture produced
under a prior Producer-Screen Actors Guild Codified Basic Agree-
ment, the principal photography of which commenced after
October 6, 1980 but prior to July 1, 1984, which is released by
Producer for exhibition in Supplemental Markets anywhere in the
world, Producer agrees to pay to Screen Actors Guild, for rate-
able distribution to the performers appearing in said pictures,
deferred compensation equal to three and six-tenths percent
(3.6%) of the "Distributor's gross receipts," as defined herein.

      With respect to each theatrical motion picture produced
under a prior Producer-Screen Actors Guild Codified Basic Agree-
ment or hereunder, the principal photography of which commenced on
or after July 1, 1984, which is released by Producer for exhibition
in Supplemental Markets anywhere in the world, Producer agrees to
pay to Screen Actors Guild, for rateable distribution to the per-
formers appearing in said pictures, deferred compensation equal to:

         (1)   From the distribution of such pictures to "Pay
Television," as defined herein, three and six-tenths percent
(3.6%) of "Distributor's gross receipts," as defined herein; and

         (2)   From the distribution of such pictures on "cas-
settes," as defined herein, four and five-tenths percent (4.5%)
of the first one million dollars ($1,000,000) of "Distributor's
gross receipts," and five and four-tenths percent (5.4%) of
"Distributor's gross receipts" thereafter.

      The foregoing amounts shall include pension and health
contributions.  Such contributions shall be at the rate provided
in and subject to the ceiling and other provisions of Section 34
hereof or the "Pension and Health Plans" provision of the Agree-
ment under which the picture was produced, whichever is applicable.

---

*The Screen Actors Guild was on strike against the Producers during
the period July 22, 1980 through and including October 5, 1980.
The terms of an interim agreement may be applicable to performers
who were employed in motion pictures produced during that period.

The term "performer" means those persons covered by this Agreement and includes performers, professional singers, stunt performers, airplane and helicopter pilots, dancers*, stunt coordinators** and puppeteers, but excludes extra performers and body doubles.  The provisions of this Section 5.2 shall not apply with respect to any performer in connection with use in Supplemental Markets if no part of the performer's performance is used in the film as released in Supplemental Markets.

B.   <u>Distribution Formula</u>

The amount received by Screen Actors Guild under the formula set forth in Paragraph A. above shall be distributed as follows:

Units will be assigned to performers entitled to participate as follows:

(1)  Time Units

With respect to each performer, units for time worked shall be computed as follows:

Each day  = one-fifth (1/5) unit
Each week = one (1) unit

No more than five (5) time units may be credited to any performer.

(2)  Salary Units

With respect to each performer, units for total compensation received from the film shall be credited as follows:

(a)  Day Performer:  Each multiple of daily scale equals one-fifth (1/5) unit.  A fraction of daily scale when more than one-half (1/2) shall be credited as another one-fifth (1/5) unit.

(b)  All Other Performers:  Each multiple of weekly scale equals one (1) unit.  A fraction of a multiple, when more than one-half (1/2) of weekly scale, shall be credited as another weekly unit.

(c)  No more than ten (10) salary units may be credited to any performer.

---

\*    Only dancers employed under Schedule J of this Agreement are entitled to participate in Supplemental Markets monies.

\*\*   Stunt coordinators employed under this Agreement are entitled to participate in Supplemental Markets monies.  All compensation paid for stunt coordinating services and any other services covered by this Agreement shall be combined in calculating salary units under this provision.

### (3)   Computation

Each performer shall be credited with the sum of time and salary units as computed above, and each performer will receive that rateable proportion of the monies as the performer's number of units bears to the total number of units for the entire cast.

C.   With respect to such pictures made outside of the United States, when part of the cast is composed of performers subject to this Agreement and part of the cast of performers is not subject to this Agreement, then sums payable hereunder shall be prorated based on the proportion which the salaries and the time worked payable to the performers subject to this Agreement bear to the total performers' salaries and time worked for the picture.  If records reflecting time worked are not reasonably available, then the aforementioned proration may be based on salaries alone.

### D.   Definition of Supplemental Markets

The term "Supplemental Markets," as used in this Agreement, means:  The exhibition of theatrical motion pictures by means of cassettes (to the limited extent provided in paragraph (1) of this subsection D.), or Pay Television, as those terms are hereafter defined in this subsection D.

### (1)   Cassettes

For the purposes of this Section, a cassette is any audio-visual device, including, without limitation, cassette, cartridge, phonogram or other similar audio-visual device now known or hereafter devised, containing a theatrical motion picture (recorded on film, disc, tapes or other material) and designed for replay through a television receiver or comparable device.  The sale or rental of cassettes for replay through a television receiver or comparable device in the home or in closed-circuit use, such as in hotel rooms, constitutes "Supplemental Markets" for the purposes of this provision, insofar as cassettes are concerned.

### (2)   Pay Television

The term "pay television," as used in this Section, shall mean exhibition of theatrical motion pictures on a television screen by means of telecast, cable, closed-circuit, satellite to home or CATV, for which substantially all systems to which the program is licensed meet the following tests:

(a)   a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel;

and/or

-17-

(b)   the subscriber pays for the motion picture or motion pictures selected (except that a motion picture or motion pictures selected for which only a token charge is made shall not be considered pay television);

and/or

(c)   the subscriber pays a fee for an encoded telecast, which fee is a major charge relative to other fees paid for encoded telecasts.

The foregoing tests cover those types of services and systems which exist in the industry today and are commonly understood in the industry today to be pay television services or systems.

The term "pay television," as used in this Section, shall also include the exhibition of theatrical motion pictures through a television receiver or comparable device by means of a telecast, cable, closed-circuit, satellite or CATV for which the viewing audience (whether by the individual viewer or by the hotel, motel, hospital or other accommodation where the viewer is) pays to receive the program by making a separate payment for such specific program.   Exhibition in theatres or comparable places by such means is theatrical exhibition and shall not be considered pay television.

The term "Supplemental Markets" does not include the exhibition of a theatrical motion picture by cassette or otherwise over a television broadcast station or in theatrical exhibition and, for this purpose, "theatrical exhibition" includes the educational market, the exhibition of theatrical motion pictures on any commercial carrier (referred to herein as "in-flight"), such as commercial airlines, trains, ships and buses, and other uses which have been traditionally considered theatrical exhibition of theatrical motion pictures, other than the specific home use hereinabove defined as "Supplemental Markets" for cassettes.

Whenever reference is made in this Section to Pay Television, such reference shall be deemed to include only those uses of theatrical motion pictures as to which a charge is actually made to the subscriber for the program viewed, or for which the subscriber has the option, by additional payment, to receive special programming over one or more special channels.   When no program charge or special channel charge is made to the subscriber in addition to the general charge, the transmission of theatrical motion pictures by the CATV or television facility, including programming originated by the CATV or television facility, is free television exhibition for the purposes of this Agreement, and such exhibition shall not be considered Supplemental Markets exhibition.

-18-

The Producers have agreed to the inclusion of Pay Television in the "Supplemental Markets" because, under the present pattern of distribution of theatrical motion pictures, Pay Television is supplemental to the primary theatrical market. The Producers reserve the right in future negotiations to contend that the pattern of release has changed so that Pay Television is no longer a Supplemental Market but constitutes or is a part of the primary market of distribution of theatrical motion pictures, and that therefore no additional payment should be made with respect to the release of theatrical motion pictures (including those covered by this Agreement) in said markets. Nothing herein shall limit the scope of negotiations on said subject.

### E. Definition of Distributor's Gross Receipts

(1) In applying the formula set forth in subsection A. of Section 5.2, Distributor's gross receipts from the Supplemental Markets (if applicable) shall be included in the formula at one hundred percent (100%) of the Distributor's gross received from Supplemental Markets after June 30, 1979.

(2) For purposes of calculating Supplemental Market fees due under this Section 5.2 arising from the distribution of theatrical motion pictures to "Pay Television," as defined above," the term "Distributor's gross receipts" shall mean the worldwide total gross receipts derived by the distributor (who may be the Producer or a distributor licensed by the Producer) from licensing the right to exhibit such picture on "pay television," as defined above; provided, however, that in the case of any such picture which is produced outside of the United States, if such picture is subject to this Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of such picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of such picture in Supplemental Markets, then no monies from any such distribution in any such foreign territory shall be included in "Distributor's gross receipts" except to the extent such foreign producer or foreign distributor is obligated to account to Producer or to the distributor of such picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

If the distributor of such picture does not distribute such picture directly in Supplemental Markets, but employs a subdistributor to so distribute such picture, then the "Distributor's gross receipts" shall be the worldwide total gross receipts derived by such subdistributor from licensing the right to exhibit such picture in Supplemental Markets. In case of an outright sale of the Supplemental Markets distribution rights for the entire world, or any territory or country, the income derived

-19-

by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Distributor's gross receipts." If any such outright sale shall include Supplemental Markets exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Producer shall allocate to the Supplemental Markets exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Distributor's gross receipts." In reaching this determination, Producer may consider the current market value of Supplemental Markets or exhibition rights in comparable motion pictures.

If the Union shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided; and in the event the Arbitrator shall find that such allocation was not reasonable and fair, he shall determine the fair and reasonable amount to be allocated. If the outright sale includes Supplemental Markets distribution rights to more than one (1) motion picture, Producer shall likewise allocate to each such picture a fair and reasonable portion of the sales price of the Supplemental Market; and if the Union contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as provided herein. If the Arbitrator shall find that such allocation was not fair and reasonable, the Arbitrator shall determine the fair and reasonable amount to be so allocated to each such picture. Nothing with respect to the price received on the outright sale of only Supplemental Markets distribution rights in a single such picture shall be subject to arbitration except that, in the event of a dispute, there may be arbitrated the question of whether the price reported by the Producer to the Guild as having been received by the Producer on such outright sale is less than the amount actually received by the Producer on such outright sale.

(3)   For purposes of calculating Supplemental Markets fees due under this Section 5.2, arising from the distribution of theatrical motion pictures on "cassettes," as defined above, the term "Distributor's gross receipts" is defined as follows:

(a)   If the Producer is the Distributor or the Distributor is owned by or affiliated with the Producer, the "Distributor's gross receipts" derived from the distribution of such picture by "cassettes" shall be twenty percent (20%) of the worldwide wholesale receipts derived by the Distributor. In such cases, if the Distributor is also the retailer, a reasonable allocation of the retail gross receipts shall be made as between the Distributor as distributor and the Distributor as retailer, and twenty percent (20%) of the former only shall be deemed to be "Distributor's gross receipts." The reasonableness of such allocation shall be subject to arbitration and, in such arbitration, generally prevailing trade practices in the cassette industry with respect to dealings between non-related companies shall be relevant evidence.

-20-

(b)   If the Distributor is not the Producer and is not owned by or affiliated with the Producer, the "Distributor's gross receipts" shall be one hundred percent (100%) of the fees received by the Producer from licensing the right to distribute such picture by cassette.

(c)   In the case of any such picture which is produced outside of the United States, if such picture is subject to this Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of such picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of such picture in Supplemental Markets, then no monies from any such distribution in any foreign territory shall be included in "Distributor's gross receipts" except to the extent such foreign producer or foreign distributor is obligated to account to Producer or to the distributor of such picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

(d)   In case of an outright sale of the Supplemental Markets distribution rights for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Distributor's gross receipts." If any such outright sale shall include Supplemental Markets exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Producer shall allocate to the Supplemental Markets exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Distributor's gross receipts." In reaching this determination, Producer may consider the current market value of Supplemental Markets or exhibition rights in comparable motion pictures.

(4)   The "Distributor's gross receipts," as that term is used herein, shall not include:

(a)   Sums realized or held by way of deposit as security, until and unless earned, other than such sums as are non-returnable;

(b)   Rebates, credits or repayments for cassettes returned (and, in this connection, the Producer shall have the right to set up a reasonable reserve for returns);

(c)   Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of such motion picture or on any monies to be remitted to or by the Producer or such other distributor, but there shall not be excluded from "Distributor's

-21-

gross receipts" any net income tax, franchise tax, or excess
profit tax or similar tax payable by the Producer or such Dis-
tributor on its net income or for the privilege of doing
business;

(d)   Frozen foreign currency until the Producer
shall either have the right to freely use such foreign currency
or Producer or Distributor has the right to transmit to the
United States to Producer or Distributor such foreign currency
from the country or territory where it is frozen.  If such cur-
rency may be utilized or transmitted as aforesaid, it shall be
deemed to have been converted to United States dollars at the
rate of exchange at which such currency was actually transmitted
to the United States as aforesaid or, if not actually trans-
mitted, then at the prevailing free market rate of exchange at
the time such right to use or to transmit occurs.

(5)   Such gross income realized in foreign currency in
any reporting period required hereunder shall be deemed to be
converted to United States dollars at the prevailing market rate
of exchange at the close of such reporting period, except that
when such gross income has actually been transmitted to the
United States, it shall be deemed converted to United States
dollars at the rate of exchange at which such foreign currency
was actually so transmitted.

Frozen foreign currency shall be deemed to be
unblocked on the basis of "first-in, first-out," unless otherwise
allocated by local foreign fiscal authorities.  Allocation of
such unblocked funds, as between revenue which serves as the
basis of determining payments hereunder and other revenue shall
be on a proportional basis, subject to different earmarking by
local foreign fiscal authorities.

(6)   If any agreement for distribution on free tele-
vision or (if applicable) in Supplemental Markets or for such
foreign territorial sale includes more than one motion picture,
the Producer shall allocate a portion of the monies payable under
such agreement to each motion picture covered by such agreement.
If any distribution agreement or foreign territorial sale agree-
ment includes any two (2) or more of free television rights,
Supplemental Markets rights or other rights, the Producer shall
allocate a portion of the monies payable under such agreement to
each of the rights covered by such agreement.  Such allocations
shall be for the purpose of determining payments due hereunder,
shall be made in good faith and, if so made, shall be binding and
conclusive for purposes of this Agreement.  If the Union contends
that such allocation has not been made in good faith, then such
claim shall be submitted to arbitration under Section 9 hereof.

For determination as to the proper allocation, the
provisions of this Section 5.2E.(6) shall not apply to any such
agreement relating only to the free television exhibition rights
or to Supplemental Markets rights in a single motion picture.

-22-

(7)   A "non-returnable advance" is to be included in "Distributor's gross receipts" when a theatrical motion picture subject to the Supplemental Markets provisions of this or any prior Codified Basic Agreement is "available" and "identifiable" and the amount of the advance payment is "ascertainable."

(a)   Such theatrical motion picture is "available" when the first of the following occurs:

(i)   The product first may be exhibited or otherwise exploited by a specified method of distribution and in a territory under the terms of the applicable license or distribution agreement, or

(ii)   It first may be sold or rented by a retailer under the terms of the applicable license or distribution agreement.

Such theatrical motion picture is "identifiable" when the Producer first knows or reasonably should have known that a given motion picture is covered by a particular license or distribution agreement for its exploitation in the applicable market.

(b)   The amount of the advance payment is "ascertainable" if:

(i)   the advance is for one theatrical motion picture, means of exhibition, and territory, or

(ii)   the total amount of the advance is for more than one motion picture, means of exhibition and/or territory, in which case the Producer shall fairly and reasonably allocate such advance among the licensed motion pictures, exhibition markets and/or territorial markets.  As each of these pictures becomes identifiable and available, the allocated portion of the non-returnable advance is to be included in the "Distributor's gross receipts" for that quarter.  The Producer shall notify the Guild of its allocation when the report of "Distributor's gross receipts" which includes the advance, is to be filed.  The Guild has the right to challenge in an arbitration a failure to allocate or any allocation that it contends is not fair and reasonable.

If such theatrical motion picture is available in any territory or by any means of exhibition, and is identifiable and the amount of the advance is ascertainable, but the Producer does not provide the Guild with the information required by this Agreement and applicable law, then the advance shall be deemed includable in "Distributor's gross receipts" no later than six (6) months after the Producer receives it.

-23-

An advance received by a Producer's parent, subsidiary or any other related or affiliated entity or successor-in-interest, or by any other entity to which the advance payment is directed by the Producer or license or distribution agreement, shall be considered as an advance payment received by the Producer.

F.     The provisions of this Section 5.2 shall not apply to the exhibition in Supplemental Markets of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, subject to the limitations provided in Section 18 hereof.

G.     Time and Method of Payments

With respect to the initial payment due hereunder for Supplemental Markets use, such payment shall be due and payable within four (4) months after initial exhibition of such motion picture in Supplemental Markets.

All such payments hereunder shall be made by check, payable to the order of the performer entitled thereto, and delivered to the Union for forwarding to such performer. Producer shall make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation provided for in this Section 5.2. Compliance herewith shall constitute payment to the performer.

In the event Producer fails to pay such additional compensation within ten (10) days from the date of a notice in writing to Producer from the Union, a late payment penalty shall accrue at the rate of one percent (1%) per month from the date of such notice; however, in no event shall the total late payment penalty with respect to any performer exceed one hundred percent (100%) of the amount owing to such performer.

The foregoing provisions shall not preclude the Producer from recovering an erroneous payment. If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, or if there is a *bona fide* dispute as to the Producer's liability therefor, there will be no late payment charge during the pendency of the dispute.

H.     Effect of Performer's Individual Contract

When compensation is payable to any performer in connection with any such picture released in Supplemental Markets, pursuant to an individual contract between such performer and Producer, and such compensation is based, in whole or in part,

-24-

upon a percentage of Producer's gross receipts, then such per-
centage compensation may be credited against such performer's
share of the monies payable by Producer to SAG hereunder or, on
the other hand, such performer's share of the monies payable
hereunder may be credited against the percentage compensation due
under the performer's personal service contract, depending upon
which such payment was made first.   Notwithstanding the forego-
ing, any compensation payable to such performer under an indi-
vidual contract when such compensation is a specified sum of
money commonly known as a "deferment," as distinguished from a
participation in the gross of a picture, may not be credited
against the monies payable by Producer to SAG hereunder.

    I.    <u>Reporting</u>

        Producer shall furnish to the Guild with respect to
each motion picture produced, covered under this Section 5.2, a
complete cast list of actors covered by this Agreement including
the name of each actor, Social Security number, type of employ-
ment contract, length of employment and the payments for Supple-
mental Markets use which will become payable to or for the
account of each actor with respect to such motion picture.   Such
cast list shall be furnished to the Guild 120 days after comple-
tion of principal photography or 90 days after completion of each
such motion picture, whichever is sooner.   Producer will there-
after furnish a revised or final list when necessary.

        Producer shall furnish to SAG written reports showing
the gross receipts from the sale, lease, license and distribution
of such picture in Supplemental Markets (whether distributed by
the Producer or through another distributor) with respect to
which the Producer is required to make payments hereunder.   Such
reports shall be furnished at least quarterly during each calen-
dar year, except in the case of an outright sale.   Concurrently
with the furnishing of such report, the Producer shall pay the
percentages due.   Producer shall also make available for inspec-
tion by SAG all distributors' statements delivered to Producer,
insofar as they relate to such gross receipts.   SAG shall have
the right, at reasonable times, to examine the books and records
of Producer as to such gross receipts pertaining to such distri-
bution of such pictures.   Producer also agrees that any agreement
entered into by it for the lease, license or distribution of any
such pictures in Supplemental Markets shall contain a provision
made expressly for the benefit of SAG and the performers involved
in such pictures, by which such lessee, licensee or distributor
agrees to assume and pay the percentage amounts payable hereunder
to SAG when and as the same become due; and copies of all such
provisions contained in such agreements, with a statement of the
name and address of the Producer and the lessee, licensee or dis-
tributor and the date of execution, shall be delivered to SAG
promptly upon the execution thereof.

-25-

An inadvertent failure to comply with the reporting provisions of this Section 5 shall not constitute a default by Producer hereunder, provided said failure is cured promptly after notice thereof from the Screen Actors Guild is received by Producer.

J.   Reopening Rights

If the member companies of the Alliance of Motion Picture & Television Producers make a "better deal" with the Directors Guild of America, Inc. or the Writers Guild of America, West, Inc., with reference to payments for the release to "Supplemental Markets" of theatrical motion pictures, the principal photography of which commenced prior to July 1, 1971, the Union shall have the right to reopen this Agreement with respect to that subject (i.e., payment for the release of such theatrical motion pictures to the Supplemental Markets) or to accept the "better deal" on that subject.  Any dispute as to whether or not a "better deal" has been made on that subject with either of said Unions shall be subject to arbitration pursuant to Section 9 hereof.  In the event that no agreement is reached in such negotiations within a period of thirty (30) days after such reopening, either the Union or the Alliance, on behalf of all its members, may, upon a thirty (30) day written notice to the other party, terminate this Agreement.

**5.3   COPYRIGHT ROYALTY TRIBUNAL**

Monies received by the Producer from distributions by the Copyright Royalty Tribunal for theatrical motion pictures produced on or after January 1, 1988 shall be subject to the payment formula set forth in Section 5 of this Agreement or the corresponding provisions of prior Codified Basic Agreements.

With respect to a free television motion picture covered under the sideletters waiving the provisions of Section 18(b)(2) and (3) of the Television Agreement (i.e., Sideletters B and B-1), any monies received by the Producer from distributions by the Copyright Royalty Tribunal for such television motion picture shall be included in the numerator of the multiplier contained in the sideletter waiving the provisions of Section 18(b)(2) and (3).

**6.   RESPONSIBILITY FOR PAYMENTS**

With respect to all theatrical motion pictures produced hereunder or under a prior Producer-Screen Actors Guild Codified

8.   ORIGINAL EMPLOYMENT - PAY TELEVISION, VIDEODISC/VIDEO-CASSETTE MARKETS

The provisions applicable to the employment of performers on entertainment programs of the type historically produced under the SAG Agreement when produced primarily for the pay television and/or the videodisc/videocassette markets appear in Section 78 of the Television Agreement.

9.   ARBITRATION

Disputes shall be arbitrable only as hereinafter in this Section set forth.

A.   Disputes involving or relating to injunctive relief are not arbitrable.

B.   Disputes involving or relating to the right of termination of a performer's individual employment contract are not arbitrable (1) except with respect to day performers, stunt performers, stunt coordinators, airplane pilots, singers, dancers employed on theatrical motion pictures, puppeteers, body doubles and freelance performers whose guaranteed compensation is less than $50,000 per picture, and (2) except as provided in subsection C.(4)(a) below.

C.   Individual Disputes between Performer and Producer

Subject to the provisions of subsections A. and B. above, only the following disputes between a performer and Producer are arbitrable:

(1)   As to a day performer, stunt performer, stunt coordinator, airplane pilot, singer, dancer employed on a theatrical motion picture, puppeteer, body double or either a freelance performer or a multiple-picture performer whose guaranteed compensation is less than $50,000 per picture, the issue of whether a contract was entered into and any dispute involving the interpretation, performance, non-performance or an alleged breach of a term or condition of the performer's contract, including claims for compensation at scale or overscale, and all disputes arising under the applicable terms of the collective bargaining agreement relating to such performer;

(2)   As to a contract performer receiving a weekly rate of compensation up to and including $4,000 per week, any dispute arising under the applicable terms of the collective bargaining agreement relating to such performer and any dispute arising under the performer's individual employment contract concerning the payment of compensation at scale or overscale;

-47-

(3)  As to all performers not expressly covered in (1) and (2) above, and except as provided in paragraph (4)(a) of this subsection C., only disputes arising under the applicable terms of the collective bargaining agreement shall be arbitrable. Except as provided in said paragraph (4)(a), disputes arising under the individual employment contract of such performers including claims for compensation therein provided, shall not be arbitrable;

(4)  With respect to contract performers receiving $4,000 per week or less, multiple-picture performers guaranteed less than $50,000 per picture, and freelance performers guaranteed less than $50,000 for the picture, the following provisions shall apply when a dispute as to any such performer arising under his individual employment contract or the collective bargaining agreement involves both a claim of compensation and the issue of termination:

(a)  When the Producer claims to have terminated or seeks a termination of the performer's individual employment contract:  (i) if the total amount of money claimed by the performer is under $75,000, the entire dispute shall be arbitrable, it being agreed that the performer's entire claim shall be presented in a single arbitration; (ii) if the total amount of money claimed by the performer is $75,000 or over, the dispute shall not be arbitrable, in whole or in part.

(b)  When the performer claims to have terminated or seeks a termination of his individual employment contract, the dispute shall not be arbitrable, in whole or in part.

(c)  If either party claims to have terminated or seeks a termination of the performer's individual employment contract, such party shall so notify the other, in writing, at any time prior to the expiration of the ten (10) days following delivery of the written statement of grievance provided for in subsection E.(3) of this Section.

D.  Disputes between Union and Producer

(1)  Starting Date - Freelance Performers

Any dispute between the Union and any Producer with respect to the issuance of any waiver referred to in the provisions of Section 4.C. of Schedules B and C of this collective bargaining agreement shall be determined, at the request of either party, by arbitration.

(2)  "Phantom Stages"

The Union has heretofore, upon request, issued waivers permitting the giving of weather-permitting calls for

-48-

work on certain stages, such as the so-called "Phantom Stage" at Universal City Studios where rain, wind or hail rendered sound recording unusable.  Similarly, waivers have been granted authorizing weather-permitting calls when caused by fog, wind, rain or hail on uncovered, tarpaulin-covered or open structures.  It is agreed that weather-permitting calls within the limits provided by the Agreement may be given to performers on such or similar stages and on open or uncovered structures when the making of usable sound track is rendered impossible because of rain, wind or hail, or when usable photography on an uncovered structure is rendered impossible by fog, wind, rain or hail.  Disputes which may arise hereunder are subject to arbitration.

(3)  All disputes between the Union and a Producer as to the interpretation of this collective bargaining agreement shall be arbitrable.

E.    Procedure

(1)  Whenever any dispute arises which is arbitrable under the provisions of this Agreement, a representative of the Union and a representative of the Producer involved shall meet within ten (10) days after a request is made for conciliation by either party and endeavor to conciliate such dispute.

The filing of a formal claim by the Union or the Producer shall be deemed an automatic request for conciliation.

Claims hereunder (other than residuals claims, claims concerning screen credit, and claims for upgrades of extra performers) shall be filed not later than the later of (i) six (6) months after the occurrence of the facts upon which the claim is based; or (ii) within six (6) months after the employee or the Guild, or the Producer, as the case may be, has had a reasonable opportunity to become aware of the occurrence.  The time period for filing claims shall be tolled while discussions to resolve the matter are taking place between the Producer and the performer's agent.

Claims concerning screen credit (Section 25) must be filed within one (1) year after the first theatrical release of a theatrical film or within one (1) year of the first television broadcast of a television film.

Residuals claims shall be filed not later than the later of:  (i) one (1) year after the occurrence of the facts upon which the claim is based; or (ii) within one (1) year after the employee or the Guild, or the Producer, as the case may be, has had a reasonable opportunity to become aware of the occurrence.

Claims for the upgrade of extra performers shall be filed not later than three (3) months after the occurrence of the facts on which the claim is based.

-49-

(2)   In the event Producer has authorized an employer association to represent Producer, Producer shall have the right to have a representative of the appropriate employer association present at such conciliation.

(3)   In the event of a failure to settle the dispute under the applicable procedure provided above, or if a party fails or refuses to meet after a request for conciliation, then, in either of such events, the Union or Producer shall deliver to the other a written demand for arbitration setting forth the material facts concerning the dispute.

The demand for arbitration shall be filed not later than one (1) year after the date of filing of the grievance.  A demand for arbitration may be filed prior to initiation or conclusion of the conciliation proceeding if it reasonably appears that the conciliation proceedings will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

The demand for arbitration shall be served upon the other party by first class mail addressed to the representative of the Union or the Producer designated to receive such service at such party's last-known address or by personal service within or without the state where the proceeding is to be held.  The other party may file a written reply within ten (10) days following the delivery of the demand for arbitration.

The arbitrator shall be selected within fifteen (15) days of the date the arbitration demand is served from a predetermined list of eleven (11) arbitrators mutually agreed upon by the Guild and the AMPTP.  The Guild and the AMPTP have agreed upon a panel of arbitrators for Los Angeles and a panel of arbitrators for New York.

The parties shall attempt to mutually agree upon an arbitrator to hear and determine the dispute.  If the parties cannot agree upon the arbitrator to be appointed, then each party shall have the right to alternately strike one name from the list until such time as one arbitrator is left.  A coin toss shall determine the party who is to strike first.  The arbitrator who is left shall be appointed as the arbitrator in the proceedings.

In the event that the Producer fails to participate in the selection process and the Producer is a member of an employer association, the Guild will contact the association, which will participate in the selection process of behalf of the Producer within ten (10) days of notification from the Guild.  In those instances in which the employer association fails to select on behalf of the Producer or in which the Producer who is not a member of an employer association fails to participate in the selection process, the Guild may unilaterally select the arbitrator from the panel.  The Producer shall unilaterally select the arbitrator from the panel if the Guild fails to participate in the selection process.

The arbitration hearing will be commenced within sixty (60) days of the date that the arbitrator is selected. The arbitration award will be issued within thirty (30) days of the date of submission.

All of the time periods herein may be extended in any particular case upon the written agreement of the parties.

Nothing herein contained shall be deemed to deprive any party of the right to assert at any time and in any proceeding, or otherwise, that the matter in question was not arbitrable hereunder.

(4)   All arbitrations hereunder, which are not instituted by Producer, shall be brought by and in the name of the Screen Actors Guild, Inc., whether such arbitration is on its own behalf or on behalf of a performer and, in the latter case, the Union may, but shall not be required to, represent the performer. The Union may, however, in its discretion, permit a performer to bring an arbitration in the name of the performer. It shall, however, be solely within the discretion of the Union whether or not the claim of a performer shall be brought to arbitration.

(5)   The cost and expenses of the arbitrator shall be shared equally by the Union and the Producer involved.

(6)   The arbitrator's decision and award shall be in writing and shall be final and binding on the Producer, the Union, the performer or performers involved and, when applicable, the performer's loan-out company.

(7)   The arbitrator shall only have authority to determine the dispute presented by the written demand for arbitration, and then only to the extent and in the manner as expressly provided by the applicable provisions of this collective bargaining agreement, as limited by the provisions of this Section 9. The arbitrator shall have no power or authority to make a finding or an award relating to the termination or right of termination of an individual employment contract of a performer, except as otherwise expressly provided in this Section 9. Nor shall the arbitrator have any power or authority to make a finding or award for or against injunctive relief. Nor shall the arbitrator have any power or authority to reform any contract involved in the arbitration.

(8)   Termination or expiration of this collective bargaining agreement shall not affect the application of the arbitration provisions of this Agreement to arbitrable disputes arising during the term of this Agreement.

F.   Recognizing that, in some cases, a dispute may involve one or more matters which are arbitrable hereunder, and one or

-51-

more matters which are not arbitrable hereunder, it is agreed
that no award in an arbitration hereunder shall affect, be used
or be admissible in any other action or proceeding relating to
matters which are not arbitrable hereunder; and no judgment or
order in any other action or proceeding shall affect, be used or
be admissible in any arbitration hereunder, but it is expressly
agreed that an arbitration award made in accordance with the pro-
visions of this Section 9 shall not be affected by any court
action or proceeding; but nothing herein shall preclude any court
of competent jurisdiction from confirming, setting aside, or
modifying any arbitration award hereunder, in any proceeding
brought for any such purpose, in accordance with applicable law.

G.   In no case may any arbitration hereunder or any award
therein affect any rights of the Producer or performer in or to
or with respect to the results and proceeds of the performer's
services or in or to or with respect to the use of the perform-
er's name, voice or likeness.

H.   All references in this Section to the termination of an
individual employment contract shall include a termination of the
performer's employment under such contract or with respect to one
or more pictures thereunder.

## 10.   NEWSREELS, TRAVELOGUES, NARRATIONS, ETC.

Newsreels, travelogues, news and sports commentators, and
persons rendering similar services in short subjects are exempt
from the operation of this Agreement.  However, narrators render-
ing services in travelogues and persons rendering similar serv-
ices in short subjects shall be deemed within the coverage of
this collective bargaining agreement.  Educational, religious and
industrial motion pictures are not covered by this Agreement.

## 11.   AGREEMENT AND SCHEDULES INCORPORATED IN PERFORMER'S
CONTRACT -- WAIVERS

A.   There are attached hereto and made a part of this col-
lective bargaining agreement the following Schedules of wage
scales and working conditions:

Schedule A -- Day Performers.

Schedule B -- Television freelance performers whose
weekly guaranteed salary is $4,000 or less per week and who are
guaranteed less than $28,500 per television picture and theatri-
cal freelance performers whose weekly guaranteed salary is $4,500
or less per week and who are guaranteed less than $45,000 per
theatrical picture.

-52-

31. **PRODUCTION TIME REPORTS, LATE PAYMENTS, OVERWITHHOLDING AND PAYROLL AND UNEMPLOYMENT INSURANCE INFORMATION**

A. <u>Production Time Reports</u>

(1)  It shall be the required custom and practice to proffer a production time report made out in ink to all performers at the end of each day, which report may include other performers in the cast (working that day), and which reflects time in and out, time of meal periods (including non-deductible breakfasts, travel (including the total number of miles round trip for studio zone locations) for such performer.  Such report shall not be offered in blank.  The performer shall initial or sign such report.  A performer may object to the accuracy of the information contained in the report.  Signing or initialing of the report by the performer shall not constitute acceptance of the report, and the performer shall not be deemed to have waived any right to file a timely claim.

(2)  Producer shall deliver a copy of the report for the previous week to the Union no later than the end of the following week.

(3)  In the event there is a substantial breach of the foregoing requirements, liquidated damages in the amount of $275 shall be payable to the Union for each day of such substantial breach.  In the event there is a dispute as to whether or not a substantial breach has occurred, the dispute shall be referred to and determined by the Cooperative Committee.  In the event the Cooperative Committee cannot determine the dispute, the matter may be referred to arbitration.

(4)  With reference to stunt performers, the amount of stunt adjustment shall be noted on the production time report or time card and shall be initialed by the stunt performer and an authorized representative of the Producer.

B. <u>Late Payments</u>

(1)  The time of payment for day performers shall be five (5) days, excluding Saturday, Sunday and holidays.  If the company is on location, checks mailed on the fifth day shall be deemed to constitute timely payment.  Time of payment for all other performers shall be as provided in this Agreement.

(2)  There shall be a $10 per day per performer late payment charge, excluding Saturdays, Sundays and holidays, for late payment applicable to all Schedules from the time payment becomes due (excluding *bona fide* emergencies of which the Union shall be given prompt notice within the time specified for payment hereunder), for a period not to exceed twenty (20) days, excluding Saturdays, Sundays and holidays, to a maximum of $200 per violation.

-84-

Upon receipt by Producer of a written notice by the Union or the performer that Producer is still delinquent, Producer shall have five (5) business days to issue the payment, including the late payment charges.

In the event payment is not made within said five (5) day period of the entire amount due, further late payment charges in the amount of $2.50 per day retroactive to the date of receipt of notice of non-payment shall be due and shall continue to accrue, without limitation, until the delinquent payment, together with late payment charges, is fully paid.

Such charges for late payment shall be in addition to all other remedies which the Union may have against Producer under the contract.

Late payment charges shall accrue commencing ten (10) business days after the settlement of a disputed claim.

(3)   If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, or if there is a *bona fide* dispute as to the Producer's liability therefor, there will be no late payment charge during the pendency of the dispute.

C.   Overwithholding

(1)   The "Part-Year Employment Method" of withholding, as currently set forth in Section 31.3402(h)(4)-1(c) of the Internal Revenue Code Regulations or any applicable successor regulations, shall be utilized for any performer upon request of the performer and the form of declaration for each such use shall be attached to the performer's employment contract.

(2)   The withholding of taxes on a weekly basis rather than on a daily basis for day performers, as then currently set forth in Internal Revenue Code Regulation Section 31.3402(c)-(1)(d)(2) or any applicable successor regulations, shall be utilized on the request of the day performer and the form of declaration for such use shall be attached to employment contracts of day performers.

(3)   The obligation of the Producer to permit the election of the foregoing alternative withholding formulae shall be effective during such time as the Internal Revenue Code Regulations permit such alternatives.

D.   Payroll and Unemployment Insurance Information

Upon request of a performer, Producer shall supply the following information, in writing, to the performer:

(1)   The name, address and state identification number of the employer of record; and

(2)   The state in which unemployment insurance is filed.

## 32.   INDUSTRY ADVANCEMENT AND COOPERATIVE FUND

The parties have agreed to establish an Industry Advancement and Cooperative Fund, the proceeds of which are earmarked for the administration of programs such as the following:  Seminars to enhance awareness of the casting and non-discrimination mandates contained in the Agreement, performers' safety, work in smoke, use of animals in motion pictures, providing showcases, proper screening procedures and verification of performers' eligibility to work in the United States.  The parties have worked out the structure and details of the fund, which is comprised of both labor and management trustees.

Funding shall be provided by an employer contribution of three-tenths of one percent (.3%) of "gross compensation," as defined in Article 34.A. of this Agreement and Section 22(a) of the Television Agreement, and subject to the ceilings set forth in those clauses, paid to performers covered under this Agreement or the Television Agreement.

## 33.   SUBCONTRACTING

Producer agrees that if Producer engages an independent contractor to photograph any footage to be used as part of a motion picture being produced hereunder by Producer, or to make still photographs or record sound tracks, then, with respect to such performers employed by such independent contractor whose employment would have been covered by the Basic Agreement had Producer employed them directly, Producer shall remain responsible under this Agreement for wages, hours and work standards provided hereunder.  This shall not apply to the acquisition by Producer of stock film footage.

## 34.   PENSION AND HEALTH PLANS

A.   The Producer-Screen Actors Guild Pension and Health Plans, established in 1960, shall be funded by contributions made by Producers under SAG collective bargaining agreements providing for such payments to the Plans.  The Trustees of such Health Plan have adopted an eligibility standard of $6,000 per year in earnings, effective January 1, 1995.  In light of that action, with respect to employment covered hereunder on motion pictures, the principal photography of which commence on or after July 1, 1995, Producer shall pay to said Plans contributions in an amount equal to thirteen percent (13%) of all gross

-86-

compensation, as and when paid by Producer to all employees covered hereunder.

The aforementioned thirteen percent (13%) shall be allocated as follows:  seven and seventy-five hundredths percent (7.75%) of the contributions to the Health Plan and five and twenty-five hundredths percent (5.25%) of the contributions to the Pension Plan.  The allocation of the thirteen percent (13%) contribution rate between the Health Plan and Pension Plan may be changed at any time during the term hereof by the Boards of Trustees of the Pension Plan and the Health Plan, based on actuarial studies.

The term "gross compensation," as used in this subsec-tion A., means all salaries and other compensation or remunera-tion, including compensation payable under Section 5 and 5.2 hereof, but only to the extent provided in said Sections, and excluding meal penalties, payments for rest period violations, traveling, lodging or living expenses, interest on delinquent payments, reimbursement for special hairdress or for wardrobe damage, but without any other deductions whatsoever.  Such term also includes amounts paid to an employee with respect to serv-ices as a performer (including compensation paid as salary settlements) whether or not any services were performed.

However, and subject to the provisions of the next paragraph of this Section 34.A. relating to exclusivity monies, holding fees and option monies, with respect to motion pictures covered hereunder, when a performer is paid compensation at a rate in excess of $200,000 per picture, such percentage shall be paid on the first $200,000 only of such performer's compensation for such picture.  Subject to the foregoing sentence, the per-centage to be paid shall apply to the performer's gross compensa-tion without any deduction whatsoever.

Amounts paid in consideration of exclusivity, for a "hold" on a performer and/or an option for acting services shall be subject to pension and health contributions up to a maximum of $40,000.  If all or a portion of the exclusivity/hold/option money is creditable against the fee due for acting services and the option is exercised, the amount so creditable shall be applied toward the $200,000 ceiling on contributions, computed as above provided.  If the exclusivity/hold/option money is not creditable against the fee due for acting services and the option is exercised, then up to one-half (1/2) of the exclusivity/hold/ option money, not to exceed $20,000, shall be applied against the pension and health contribution ceiling.  This paragraph shall apply to all claims for pension and health contributions on exclusivity/hold/option monies outstanding on July 1, 1995 and to exclusivity/hold/option agreements entered into after July 1, 1995.

In addition to the foregoing money ceiling of $200,000, the following money ceilings for term contract performers shall be applicable to contributions to the Pension and Health Plans:

-87-

(1)   Combination Term Contract

With respect to compensation for services in television motion pictures under such a contract, the appropriate ceilings set forth in the applicable Producer-SAG Television Agreement shall apply.

(2)   Theatrical Term Contract

The $200,000 per picture ceiling referred to above with respect to the application of the pension and health contribution shall be computed as follows:

If the performer's individual employment contract contains a restriction on the number of theatrical pictures he may do in the period to which the restriction applies, then his total compensation for such period divided by that number determines his gross compensation per picture.

If there is no limitation on the number of pictures the performer may be required to do in the current contract term, then his total compensation for such term divided by the number of pictures in which he actually performed determines his gross compensation per picture.

If, on the expiration of any contract term, the performer is engaged in performing services in a picture and the Producer does not extend such current contract term, but exercises an option for the succeeding term and completes the production of such picture during such succeeding term, then, for the purpose of computing gross compensation paid to the performer for such picture, all gross compensation paid to the performer during the period such services are rendered in the completion of such picture shall be deemed to have been paid the performer during such contract term, and such picture shall be deemed to have been completed during such current contract term.

If the performer does not perform in any theatrical picture during any contract term, then there is no ceiling with respect to such contract term.

In each instance in which a "contract term" is referred to in this subparagraph (2), the same shall be deemed to include all extensions thereof.

B.   Each Plan shall be administered by thirty-six (36) Trustees, eighteen (18) appointed by the Alliance of Motion Picture & Television Producers and ANA-AAAA Joint Policy Committee on Broadcast Talent Union Relations, in accordance with the allocation described below, and eighteen (18) appointed by the Union.  The appointing authority shall also have the right at any time to remove any Trustee appointed by it and to substitute another Trustee.

-88-

The number of Trustees to be allocated to the respective employer associations shall be subject to review every three (3) years following the establishment of the Plans. At such times, the Trustees to be allocated to each employer association for the ensuing three (3) year period shall be determined in accordance with the proportion which the total cumulative contributions to the Plans, for the preceding three (3) year period, made by the members of each such employer association bear to the total contribution to the Plans made by members of all such employer associations during such period.

The references in this Section 34 to any employer association shall apply to any employer association which may be or become a successor thereto.

C.   The Pension and Health Plans shall be industry-wide and open to all Producers signatory to any of SAG's collective bargaining agreements which provide for payments to the Plans, as above set forth. By signing a letter of adherence to the Trust Agreement (hereinafter described), and upon acceptance by the Trustees, such other Producers shall be deemed to be parties to the Plans and to have appointed the Producers' Trustees previously appointed.

D.   The funds contributed under the Pension Plan (hereinafter referred to as the "Pension Plan") and the Health Plan (hereinafter referred to as the "Health Plan") shall each constitute a separate Trust Fund created by a Trust Agreement to be executed by the parties to this Basic Agreement and adopted by the Trustees. The Trust Fund for the Pension Plan shall be used solely for the purpose of providing pension benefits, and for expenses connected with the establishment and administration of the Plan. The Trust Fund for the Health Plan shall be used solely for the purpose of providing health benefits for employees covered by SAG's collective bargaining agreements in the motion picture industry, who are eligible for such benefits under the Plan and, in the discretion of the Trustees, for their families and for expenses connected with the establishment and administration of the Health Plan.

E.   The Trustees shall determine the form, nature and amount of pension and health benefits, respectively, the rules of eligibility for such benefits and the effective dates of such benefits. The health benefits may include, in the discretion of the Trustees, any one or more of the following benefits: death, accidental death, injury, disability, hospitalization, surgical expense and medical expense, and any other benefits permitted by law.

F.   The Pension Plan and the Health Plan provided for herein, including the respective plans of benefits thereunder, shall be subject to the approval of the Internal Revenue Service as

-89-

qualified Plans and as an appropriate business expense. If any part of either Plan is not so approved by the Internal Revenue Service, such Plan shall be modified by the Trustees, to such form as is approved by the Internal Revenue Service.

G.   The Agreement and Declarations of Trust shall provide that no portion of the contributions thereunder may be paid or revert to any Producer.

H.   Each Producer shall furnish the Trustees, upon request, with the required information pertaining to the names, job classification, Social Security numbers and wage information for all persons covered by this Agreement, together with such information as may be reasonably required for the proper and efficient administration of the Pension and Health Plans.  Upon the written request of SAG to the Producer, such information shall be made available to SAG.

I.   These provisions for the Pension and Health Plans are in addition to, and not in substitution, in whole or in part, for any other existing pension and/or health plan covering any of the performers coming under this Agreement; and no performer shall lose, in whole or in part, any of his rights or privileges under such other pension and/or health plan by virtue of receiving or being entitled to receive benefits under the Pension and Health Plans.  No payments, rights or privileges available to a performer under the Pension and Health Plans may be credited to any payments, rights or privileges to which such performer may be entitled under any other pension and/or health plan, and vice versa.  However, the Health Plan may provide for a non-duplication of benefits with respect to persons coming under both this Health Plan and the AFTRA Health Plan.

J.   No part of the Producers' contributions to the Plans may be credited against the performer's overscale compensation or against any other remuneration that the performer may be entitled to, no matter what form such other remuneration may take, nor shall it be subject to any talent agency commissions or other deductions; nor shall such contributions constitute nor be deemed to be wages due to the individual employees subject to this Agreement, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

K.   Loan-outs

The following shall apply with respect to the payment of pension and health contributions due when a Producer borrows the services of a performer from a loan-out company, as defined herein, and such performer is used by Producer within the jurisdiction of this Agreement.  For purposes of this provision, a loan-out company is defined as a company, whether or not signatory to this Agreement, which is controlled by the loaned-out performer who is performing work covered by this Agreement.

-90-

(1)  Pension and health contributions, subject to the ceilings, shall be based on the loan-out price for the performer's covered acting services.

(2)  When other than covered acting services are being provided by the loan-out company, Producer agrees to separately state the compensation for covered acting services.  If there is a dispute over the portion of the loan-out price allocated to the performer's acting services, the performer's "customary salary" shall be given substantial consideration in resolving such dispute.

(3)  Agreements with loan-out companies for covered services of the loaned-out performer shall provide that Producer shall make pension and health contributions directly to the Plans on behalf of the loan-out company.

L.  Audits

(1)  If, under the 1983 or any prior SAG Agreement, a loan-out company, as defined above, has failed to make the applicable pension and health contributions on behalf of the loaned-out performer pursuant to the provision corresponding to Section 36.K.(3)(b) of the 1986 SAG Agreement, Producer shall not be liable for such contributions if the loan-out company failed to pay such contributions more than four (4) years prior to the date of commencement of the audit that gives rise to the claim (whether or not it is of the loan-out company's records or the borrowing Producer's records).  The date of commencement of the audit shall be deemed to be the date of actual audit entry, but in no event later than ninety (90) days after the date of the Plans' notice of intent to audit.  The foregoing limitation shall apply to claims for contributions on behalf of loaned-out performers arising under the 1986 and 1989 Agreements, provided that the notice requirements set forth in Section 36.K.(3)(b) of the 1986 Agreement (or the corresponding provision of the 1989 Agreement) have been met.  In the event that the Plan(s) conclude, based on an audit of a loan-out company's records, that there exists a claim for unpaid contributions, the Plan(s) or the Union must give the borrowing Producer written notification of any such claim for unpaid contributions at the time that the loan-out company is notified of such claim.  In no event will the borrowing Producer be liable for any such unpaid contributions which were due from the loan-out company more than four (4) years prior to the date that the borrowing Producer was notified of the loan-out company's failure to make the contribution.

(2)  Claims against Producer pursuant to subsection K.(3) above for pension and health contributions on behalf of performers borrowed from a loan-out company, or claims against Producer on behalf of performers employed directly by the Producer, must be brought within four (4) years from the date of filing of the compensation remittance report covering such performers.

-91-

(3)  Any claim for contributions not brought within the four (4) year periods referred to in subsections L.(1) and (2) above shall be barred.

M.  Adherence to Plans

By signing this Agreement, Producer thereby applies to become a party to and agrees to be bound by the Screen Actors Guild-Producers Pension Plan Trust Agreement and the Pension Plan adopted thereunder; and the Screen Actors Guild-Producers Health Plan Trust Agreement and the Health Plan adopted thereunder, if the Producer is not already a party to said Agreements and Plans.

Producer further hereby accepts and agrees to be bound by all amendments and supplements heretofore and hereafter made to the foregoing Agreements and documents.

Producer hereby accepts the Producer Plan Trustees under said Trust Agreements and their successors designated as provided therein.

N.  Crediting Residuals Earnings in Excess of Contractually-Established Ceilings

The parties jointly recommend that the Trustees of the Producers-Screen Actors Guild Health Plan take appropriate measures to address the problem of crediting residual earnings in excess of the contractually-established ceilings to performers who receive such earnings and who are not otherwise eligible for health coverage.

35.  ADDITIONAL PROVISIONS

A.  Evasion

It is the policy of the Producer not to intentionally evade the provisions of this Agreement by acquiring pictures produced in the United States and which are made under terms and conditions less favorable than those provided herein.

B.  Overnight Locations

(1)  Notification

Performers shall be notified by Producer at the time of engagement, to the extent such information is then known, whether the engagement requires overnight location work and, if so, the approximate time and duration of such location work.

Agreements has been unintentionally omitted from this codification, such party may request its inclusion herein; the Union and the Alliance of Motion Pictures & Television Producers agree to promptly discuss the request and, if they determine that the provision was unintentionally omitted, then the parties agree to include such provision in this codification.

C.    Except as otherwise provided, these provisions cover new or increased minimum scale compensation for services (including such new or increased compensation resulting from new or different working conditions), new or increased minimum payments or contributions based upon compensation, and new or increased rerun and residual payments to be paid to the employees covered by the terms of the Agreement.

D.    This Agreement may be referred to as the **PRODUCER-SCREEN ACTORS GUILD CODIFIED BASIC AGREEMENT OF 1995.**

## 41.   RULES OF CONSTRUCTION

A.    The language in all parts of this Agreement shall in all cases be construed simply according to its fair meaning, and not strictly for or against the Union or the several Producers. Unless otherwise specifically defined herein, the terms used shall be given their common meaning in the motion picture industry.

B.    The headings of Sections or subsections are not a part of this Agreement and shall not be construed as altering the meaning of the text of this Agreement.

C.    If any portion of this Agreement shall be held illegal, such portion shall be ineffective, but if such portion is a major provision of this Agreement, either party may thereupon terminate this Agreement on ninety (90) days' written notice to the other party.

## 42.   SERVICE OF NOTICES

Any notice which either party may desire to serve upon the other may be served personally in Los Angeles County upon a corporate officer of such party or by registered mail, postage prepaid, addressed to such party at its principal place of business in Los Angeles County.  The Union agrees that a copy of any such notice shall be delivered or mailed, as aforesaid, to the Alliance of Motion Picture & Television Producers at its office in Los Angeles County.

## 43.   NUDITY

A.    The Producer's representative will notify the performer (or his representative) of any nudity or sex acts expected in the

-96-

**"EXHIBIT E "**

July 8, 2008

Via Certified Mail
Return Receipt Requested

Shadowboxer, LLC
Attn: Lee Daniels
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Re:     "Shadowboxer"
        - **Theatrical Motion Picture**
        - **Delinquent Residuals and Reporting**

Dear Mr. Daniels:

Screen Actors Guild ("SAG") records indicate the release of the above-referenced theatrical motion picture ("Picture") in supplemental markets, triggering residuals obligations. Pursuant to the Theatrical Adherence Letter executed by Shadowboxer, LLC ("Shadowboxer") on April 1, 2004, the Picture is bound to the SAG Codified Basic Agreement ("Agreement"). Sections 5 and 5.2 of the Agreement require residuals payments and reporting of Distributor's gross receipts quarterly for these exploitations. To date, Shadowboxer has neither provided written reports nor made residuals payments and must bring these obligations current.

Section 5.2A.(2) of the Agreement requires payment of four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of worldwide Distributor's receipts and five and four-tenths percent (5.4%) of worldwide Distributor's gross receipts thereafter, including any non-returnable advance, derived from the distribution of the Picture on video/DVD be made to the performers for residuals.

Please be advised that delinquent residuals are subject to late-payment liquidated damages ("LPLDs"). Pursuant to the terms of the Agreement, LPLDs of one percent (1%) per month on the unpaid balance will begin to accrue from the date of delinquency if payment in full on all residuals now due and owing in all markets is not received within ten (10) days from the date hereof.

continued.../

Shadowboxer, LLC
Attn: Lee Daniels

July 8, 2008

Page 2

**Re:**     **"Shadowboxer"**
-     **Theatrical Motion Picture**
-     **Delinquent Residuals and Reporting**

When remitting residuals payments, please include any accrued LPLDs and a payment schedule. The residuals checks are to be made payable to the individual performers (less any applicable payroll deductions) and forwarded to my attention for distribution. Pension and health contributions should be paid directly to the SAG-Producers Pension & Health Plans.

This is a "Statement of Claim and Request for Conciliation" within the meaning of Section 9 of the Basic Agreement and, as such, commences the process that may result in formal arbitration.

Please contact me upon your receipt of this letter if you have any questions regarding compliance with the foregoing. Thank you for giving this matter your immediate attention.

Sincerely,

Andrea Cvitanovich
Business Representative
Residuals Claims
Phone: (323) 549-6454
Email: acvitanovich@sag.org

AC:bh

July 8, 2008

Via Certified Mail
Return Receipt Requested

Lee Daniels Entertainment Limited
Attn: Lee Daniels
434 Broadway, Suite 403
New York, NY 10013

Re:   "Shadowboxer"
      - **Theatrical Motion Picture**
      - **Delinquent Residuals and Reporting**

Dear Mr. Daniels:

Screen Actors Guild ("SAG") records indicate the release of the above-referenced theatrical motion picture ("Picture") in supplemental markets, triggering residuals obligations. Pursuant to the Guaranty Agreement executed by Lee Daniels Entertainment, Limited ("LDE"), the Picture is bound to the SAG Codified Basic Agreement ("Agreement"). Sections 5 and 5.2 of the Agreement require residuals payments and reporting of Distributor's gross receipts quarterly for these exploitations. To date, LDE has neither provided written reports nor made residuals payments and must bring these obligations current.

Section 5.2A.(2) of the Agreement requires payment of four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of worldwide Distributor's gross receipts and five and four-tenths percent (5.4%) of worldwide Distributor's gross receipts thereafter, including any non-returnable advance, derived from the distribution of the Picture on video/DVD be made to the performers for residuals.

Please be advised that delinquent residuals are subject to late-payment liquidated damages ("LPLDs"). Pursuant to the terms of the Agreement, LPLDs of one percent (1%) per month on the unpaid balance will begin to accrue from the date of delinquency if payment in full on all residuals now due and owing in all markets is not received within ten (10) days from the date hereof.

continued.../

**SCREEN ACTORS GUILD**
5757 WILSHIRE BOULEVARD ☆ LOS ANGELES, CALIFORNIA 90036-3600 ☆ Tel. 800.SAG.0767 ☆ Fax 323.549.6500
www.sag.org
Branch of Associated Actors and Artistes of America / AFL-CIO •❮❙❙❯• ★ Affiliate of International Federation of Actors

Lee Daniels Entertainment Limited
Attn: Lee Daniels

July 8, 2008

Page 2

Re:     "Shadowboxer"
-   **Theatrical Motion Picture**
-   **Delinquent Residuals and Reporting**

When remitting residuals payments, please include any accrued LPLDs and a payment schedule. The residuals checks are to be made payable to the individual performers (less any applicable payroll deductions) and forwarded to my attention for distribution. Pension and health contributions should be paid directly to the SAG-Producers Pension & Health Plans.

This is a "Statement of Claim and Request for Conciliation" within the meaning of Section 9 of the Basic Agreement and, as such, commences the process that may result in formal arbitration.

Please contact me upon your receipt of this letter if you have any questions regarding compliance with the foregoing. Thank you for giving this matter your immediate attention.

Sincerely,

Andrea Cvitanovich
Business Representative
Residuals Claims
Phone: (323) 549-6454
Email: acvitanovich@sag.org

AC:bh

**"EXHIBIT F "**

LEGAL DEPARTMENT

WRITER'S DIRECT DIAL:

(323) 549-6044

WRITER'S E-MAIL:

ahoover@sag.org

May 7, 2009

## VIA CERTIFIED AND REGULAR U.S. MAIL

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131st Street, Suite 2
New York, NY 10037

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th Street, Suite 1002
New York, NY 10018

Re:     "Shadowboxer"
        SAG Case No. TM 4752

Dear Parties:

The Screen Actors Guild has attempted to settle the above-referenced dispute without the need for arbitration. As efforts to conciliate this matter have been unsuccessful, I have enclosed a formal Statement of Claim and Demand for Arbitration.

Please contact me within fifteen (15) days of the date of this letter so we can discuss resolution of this dispute or selection of an arbitrator. If I do not hear from you, the Guild will exercise its right under the applicable collective bargaining agreement to unilaterally select an arbitrator. I look forward to speaking with you.

Very truly yours,

Allison Hoover
Counsel

Enclosure

1   Allison Hoover (SBN 239435)
    Screen Actors Guild, Inc.
2   Legal Department
    5757 Wilshire Blvd., 7ᵗʰ Floor
3   Los Angeles, CA 90036-3600
    Telephone: (323) 549-6044
4   Facsimile: (323) 549-6624

5   Attorney for Claimant

6

7

8                   BEFORE THE PRODUCER-SCREEN ACTORS GUILD

9                           SOLE NEUTRAL ARBITRATOR

10

11  SCREEN ACTORS GUILD, INC., a non-profit        Case No.: TM 4752
    corporation, on behalf of Affected Performers,
12  and 20 Doe Performers,                          STATEMENT OF CLAIM AND
                                                     DEMAND FOR ARBITRATION
13            Claimant,

14  v.

15  SHADOWBOXER, LLC; and LEE DANIELS
    ENTERTAINMENT, LTD.;
16
              Respondents.
17
    Re: "Shadowboxer"
18

19            PLEASE TAKE NOTICE that Claimant Screen Actors Guild, Inc. ("the Guild") submits

20  the following dispute to arbitration pursuant to Section 9 of the Screen Actors Guild Codified

21  Basic Agreement of 1995 for Independent Producers, as amended ("CBA").  The basis of the

22  dispute, material facts, position of the Guild, and relief sought are set forth below under the

23  heading "Arbitration Claim," in the attachments, and upon such further oral or documentary

24  evidence that may be presented during the arbitration.

25            Section 9(F)(3) of the CBA states in pertinent part:  "[t]he arbitrator shall be selected

26  within fifteen (15) days of the date the arbitration demand is served from a predetermined list of

27  eleven (11) arbitrators mutually agreed upon by the Guild and the [Alliance of Motion Picture

28  and Television Producers]."

                                            - 1 -

1    Section 9(F)(3) of the CBA further states in pertinent part, "[t]he [Respondents] may file

2    a written reply within ten (10) days following the delivery of the demand for arbitration."

3    To facilitate selection the Guild submits the following list of prospective arbitrators: Sara

4    Adler, Howard Block, Wayne Estes, Norman Brand, Joseph Gentile, Fred Horowitz, Stuart

5    Mandel, Michael Rappaport, Sol Rosenthal, and Myron Slobodien. The Guild requests that the

6    arbitration be held at its office located at 5757 Wilshire Boulevard in Los Angeles, California.

7

8                              **ARBITRATION CLAIM**

9                          **(Allegations Common to All Counts)**

10    1.    Shadowboxer, LLC ("Shadowboxer" or "Producer") and Lee Daniels

11    Entertainment, Ltd. ("LDE"), are signatory to, or otherwise bound by, the Screen Actors Guild

12    Codified Basic Agreement of 1995 for Independent Producers, as amended, (the "CBA").

13    2.    During the term of the CBA, Shadowboxer produced or is producing a motion

14    picture that is or has been known as *"Shadowboxer"* ("Picture").

15    3.    LDE executed a Guaranty Agreement, guaranteeing the performance by

16    Shadowboxer of all terms and obligations under the CBA.

17    4.    Based upon information and belief, the Guild alleges that LDE ("Distributor")

18    distributed the Picture.

19    5.    Based upon information and belief, the Guild alleges that Distributor is a

20    transferee of copyright ownership within the meaning of the Digital Millennium Copyright Act

21    ("DMCA"), 28 U.S.C. § 4001.

22    6.    Based upon information and belief, the Guild alleges that Distributor has actual or

23    constructive knowledge that the Picture was subject to the terms of a collective bargaining

24    agreement; thus Distributor is deemed to have executed the Guild's Distributor's Assumption

25    Agreement ("DAA") pursuant to 28 U.S.C. § 4001(a).  Distributor is therefore jointly and

26    severally liable with Shadowboxer for the deferred compensation ("residuals") due pursuant to

27    the CBA.

28    7.    The Digital Millennium copyright Act provides the following:

- 2 -

In the case of a transfer of copyright ownership under United States law in a motion picture (as the terms "transfer of copyright ownership" and "motion picture" are defined in section 101 of title 17) that is produced subject to one or more collective bargaining agreements negotiated under the laws of the United States, if the transfer is executed on or after the effective date of this chapter and is not limited to public performance rights, the transfer instrument shall be deemed to incorporate the assumption agreements applicable to the copyright ownership being transferred that are required by the applicable collective bargaining agreement, and the transferee shall be subject to the obligations under each such assumption agreement to make residual payments and provide related notices, accruing after the effective date of the transfer and applicable to the exploitation of the rights transferred, and any remedies under each such assumption agreement for breach of those obligations, as those obligations and remedies are set forth in the applicable collective bargaining agreement, if -- (A) the transferee knows or has reason to know at the time of the transfer that such collective bargaining agreement was or will be applicable to the motion picture . . . . 28 U.S.C. § 4001(a)

8.     A "transfer of copyright ownership" is defined as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright …".17 U.S.C    . Section 101.

9.     The Guild has filed Statements of Claim and Requests for Conciliation seeking payment to the Performers of additional compensation that has become due to them as set forth herein.

10.     The Guild requests arbitration of this dispute pursuant to Section 9(E) of the CBA because the Guild has been unsuccessful in its efforts to reach a complete resolution with Respondents.

## COUNT ONE

### Failure to Report and Pay Residuals and Late Pay Liquidated Damages

(against all Respondents)

11.     The Picture was released to markets including, but not limited to, free TV and one or more supplemental markets, and, by virtue thereof, additional compensation, contributions to the Producer-Screen Actors Guild Pension and Health Plans ("Plans"), and late payment liquidated damages are due and owing in accordance with the CBA.

12.     Despite demands therefore, Respondents have failed to pay compensation as

- 3 -

required by Sections 5.0 and 5.2 of the CBA with respect to the exploitation of the Picture in the Free TV market and supplemental markets, as defined by the CBA.

13.     Late payment liquidated damages ("LPLDs") of 1% per month and appropriate pension and health contributions are also due under Sections 5(E)(2), 5.2(G) and 34 of the CBA for exploitation of the Picture on pay television, basic cable, and in Supplemental Markets.

14.     The Guild demands, pursuant to Sections 5(G) and 5.2(I) of the CBA, that Respondents immediately submit the following to the Guild:

A.     copies of all licensors' and distributors' statements showing gross receipts derived from exploitation of the Picture;

B.     copies of all contracts in which the right to distribute the Picture on free television, or in Supplemental Markets was assigned, transferred, leased, licensed, or sold;

C.     names, addresses, and telephone numbers of all persons and entities who have within their possession or control licensors' and distributors' statements, contracts, and any other books and records relating to the exploitation of the Picture on free television, or in Supplemental Markets;

D.     number of performers in production, the dates each worked, and dates of exhibition on free television, or in Supplemental Markets; and

E.     number of units sold.

15. A failure to provide such documents shall be considered an additional breach of the CBA for which the Guild will seek further relief.

## COUNT TWO

### Failure to Contribute to Pension and Health Plans

(against all Respondents)

16.     Section 34 of the CBA requires Respondents to contribute to the Producer-Screen Actors Guild Pension and Health Plans ("Plans") the appropriate percentage of all gross compensation paid to the Performers.

- 4 -

17.     Respondents have breached the CBA by failing to make such contributions to the Plans with respect to the additional compensation that the Guild seeks herein.

18.     The Guild is entitled to damages for this breach in an amount to be ascertained and for other relief mentioned below.

## COUNT THREE

### Failure to Obtain Assumption Agreements

(against Shadowboxer)

19.     Shadowboxer failed to obtain and deliver an assumption agreement from Distributors of the Picture, as required by Sections 5G, 5.2I, and 6 of the CBA, under which a distributor or buyer agrees to assume and make the additional compensation payments and pension and health plan contributions required by reason of the distribution of the Picture on free television, and/or in Supplemental Markets.

20.     Section 6G of the CBA provides:  "The failure of Producer to obtain and deliver an executed assumption agreement, as provided in Sections 6A and 6B hereof, shall be deemed a substantial breach of this Agreement."

21.     This substantial breach entitles the Guild to additional damages in an amount to be ascertained and for other relief requested below.

## COUNT FOUR

### Security Agreement Default

(against Shadowboxer)

21.     Shadowboxer is in default under the terms of the Security Agreement for its failure to render full, timely, and faithful performance of all terms, provisions, covenants, conditions, agreements, and obligations required by the CBA and the Security Agreement, including, but not limited to, Shadowboxer's failure to report and pay residuals to certain Performers.

22.     The Guild is entitled to additional damages in an amount to be ascertained and other relief mentioned below.

**WHEREFORE**, the Guild seeks the following:

1.     An accounting of gross receipts under Sections 5 and 5.2 of the CBA for Respondents' exploitation of the Picture in the Free TV and Supplemental Markets;

2.     An order requiring Respondents to transmit to the Guild <u>either</u> of the following:

> (a)     individual checks representing the total compensation and late payment liquidated damages due and owing to each individual performer under the CBA (less all required withholding taxes) made payable to each affected individual performer; <u>or</u>

> (b)     one check made payable to the "Screen Actors Guild" in the sum of all compensation and late payment liquidated damages due and owing to all affected performers under the CBA <u>plus</u> an additional 15.05% thereof for applicable state and federal payroll taxes and 2.5% thereof for the services of a payroll house;

3.     An order requiring Respondents to transmit directly to the Pension and Health Plan, a check made payable to the "Producer-Screen Actors Guild Pension and Health Plans" representing appropriate contributions to said Plans under the CBA;

4.     An order granting the Guild an irrevocable assignment of Producer's accounts receivables from the worldwide exploitation, distribution, exhibition, or other use of the Picture until the amounts awarded herein are paid in full;

5.     An order releasing the security deposit held by the Guild in connection with the Picture for immediate release and disbursement to the Performers;

6.     A declaration that Respondents are in default under the terms of the CBA on several counts, including Respondents' failure to report and pay residuals, and contribute to the Pension and Health Plan.

7.     All costs and fees incurred by the Guild in this arbitration; and

1      8.     Such other and further relief as the Arbitrator may deem proper.

2

3  Dated: May 7, 2009               SCREEN ACTORS GUILD, INC.

4

5                        By: _____

6                           ALLISON HOOVER
                           Attorney for Claimant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Allison Hoover (SBN 239435)
    Counsel
2   Screen Actors Guild, Inc.
    5757 Wilshire Blvd., 7ᵗʰ Floor
3   Los Angeles, CA 90036-3600
    Telephone: (323) 549-6044
4   Facsimile: (323) 549-6624

5   Attorney for Claimant

6

7

8                    BEFORE THE PRODUCER-SCREEN ACTORS GUILD

9                              SOLE NEUTRAL ARBITRATOR

10

11  SCREEN ACTORS GUILD, INC., a non-profit      )   Case No.: TM 4752
    corporation, on behalf of Affected Performers, )
12                                                )   **PROOF OF SERVICE**
                                                  )
13            Claimant,                           )
                                                  )
14  v.                                            )
                                                  )
15  SHADOWBOXER, LLC; and LEE DANIELS             )
    ENTERTAINMENT, LTD.                           )
16                                                )
                                                  )
17            Respondents.                        )
                                                  )
18                                                )
                                                  )
19                                                )
                                                  )
20  Re: *"Shadowboxer"*                           )
                                                  )
21                                                )
                                                  )
22

23       I, Trixie America Talavera, declare:

24       I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and

25  am not a party to the above-captioned action.  My business address is 5757 Wilshire Blvd., 7ᵗʰ Floor,

26  and Los Angeles, CA  90036.

27       On **May 7, 2009**, at my employer's above-stated place of business, I served the document

28  described as **Statement of Claim and Demand for Arbitration** on interested parties in this action by

---

1

PROOF OF SERVICE

1    enclosing one true copy thereof in an envelope to be sent by regular first-class mail, and one true copy

2    thereof to be sent by certified mail – return receipt requested, in separate sealed envelopes to the

3    following addressee(s):

4

5         Shadowboxer, LLC                          Lee Daniels Entertainment, Ltd.
          Attn: Lee Daniels                         Attn: Lisa Cortes
6         39 W. 131st Street, Suite 2               315 W. 36th Street, Suite 1002
          New York, NY 10037                        New York, NY 10018

7         I am readily familiar with my employer's business practice for collection and processing of

8    correspondence for mailing with the United States Postal Service.  I deposited such envelope(s) with

9    postage thereon fully prepaid in a collection box from where it would be placed in the United States

10   Mail at Los Angeles, California that same day in my employer's ordinary course of business.

11        I declare under penalty of perjury under the laws of the State of California that the foregoing is

12   true and correct.

13        Executed this 7th day of May, 2009 at Los Angeles, California.

14

15

16                                                  Trixie America Talavera

17

18

19

20

21

22

23

24

25

26

27

28

1.800.538.490
www.lasersub.c

LaserSubstrates, Inc.™

APPROVED
POSTAL SERVICE

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

7107 2287 2530 0008 2480

| | | |
|---|---|---|
| Postage | $ $0.42 | |
| Certified Fee | $2.70 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | $2.20 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.32 | |

Shadowboxer, LLC

Sent To
**Attn: Lee Daniels**
Street, Apt. No.;    **39 W. 131st Street, Suite 2**
or PO Box No.       **New York, NY 10037**
City, State, Zip+4
                    5/7/2009  10:14 AM

PS Form 3800, August 2006          See Reverse for Instructions

CERTIFIED MAIL™

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

File: "Shadowboxer" - TM 4752 - Demand

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131st Street, Suite 2
New York, NY 10037

Batch #: 9604
Article #: 71072287253000082480
Date/Time: 5/7/2009 10:14:15 AM
Code:
Code2:
File #: "Shadowboxer" - TM 4752 - De
Internal File #:
Internal Code #:

**2. Article Number**

7107 2287 2530 0008 2480

1. Article Addressed to:

**Shadowboxer, LLC**
**Attn: Lee Daniels**
**39 W. 131st Street, Suite 2**
**New York, NY 10037**

5/7/2009  10:14 AM

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES enter delivery address below:        ☐ No

3. Service Type        ☒ Certified

4. Restricted Delivery? (Extra Fee)        ☐ Yes

File: "Shadowboxer" - TM 4752 - Demand

PS Form 3811                Domestic Return Receipt

Reorder Form LCD-811 rev. 01/07
1-800-538-4900
www.printcertifiedmail.com

① SEPARATE AT PERFORATION

② REMOVE LABEL AN
RECEIPT FROM BAC
PLACE LABEL AT TO
ENVELOPE TO THE R
OF THE RETURN AD

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**Allison Hoover**
**Legal Department**
**Screen Actors Guild**
**5757 Wilshire Blvd.**
**Los Angeles, CA**         **90036-3600**

OPTIONAL LABEL

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131st Street, Suite 2
New York, NY 10037

③

LIFT HERE

1.800.538.49
www.lasersub.

**LaserSubstrates, Inc.** ™

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

| | | |
|---|---|---|
| Postage | $ $0.42 | |
| Certified Fee | $2.70 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | $2.20 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.32 | |

Lee Daniels Entertainment, Ltd.

Sent To

Attn: Lisa Cortes
Street, Apt. No.;  315 W. 36th Street, Suite 1002
or PO Box No.  New York, NY 10018
City, State, Zip+4

5/7/2009  10:14 AM

PS Form 3800, August 2006        See Reverse for Instructions

7107 2287 2530 0008 2497

CERTIFIED MAIL ™

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

File: "Shadowboxer" - TM 4752 - Demand

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th Street, Suite 1002
New York, NY 10018

Batch #: 9605
Article #: 71072287253000082497
Date/Time: 5/7/2009 10:14:53 AM
Code:
Code2:
File #: "Shadowboxer" - TM 4752 - De
Internal File #:
Internal Code #

**2. Article Number**

7107 2287 2530 0008 2497

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery

1. Article Addressed to:

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th Street, Suite 1002
New York, NY 10018

5/7/2009  10:14 AM

D. Is delivery address different from Item 1?  ☐ Yes
If YES enter delivery address below:          ☐ No

3. Service Type      ☒ Certified

4. Restricted Delivery? (Extra Fee)      ☐ Yes

File:  "Shadowboxer" - TM 4752 - Demand

Reorder Form LCD-811 rev. 01/07
1-800-538-4900
www.printcertifiedmail.com

PS Form 3811        **Domestic Return Receipt**

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**Allison Hoover**
**Legal Department**
**Screen Actors Guild**
**5757 Wilshire Blvd.**
**Los Angeles, CA**        **90036-3600**

OPTIONAL LABEL

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th Street, Suite 1002
New York, NY 10018

① SEPARATE AT PERFORATION

② REMOVE LABEL AN
RECEIPT FROM BA
PLACE LABEL AT TH
ENVELOPE TO THE
OF THE RETURN AD

③

LIFT HERE

7107 2287 2530 0008 2497

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent
                             ☐ Address

B. Received by (Printed Name)   C. Date of Delivery

Article Addressed to:

**Lee Daniels Entertainment, Ltd.**
**Attn: Lisa Cortes**
**315 W. 36th Street, Suite 1002**
**New York, NY 10018**

5/7/2009  10:14 AM

D. Is delivery address different from item 1?   ☐ Yes
   If YES enter delivery address below:          ☐ No

**RECEIVED**

MAY 2 1 2009

SCREEN ACTORS GUILD
LEGAL DEPARTMENT

3. Service Type  ☒ Certified

4. Restricted Delivery? (Extra Fee)   ☐ Yes

File:  "Shadowboxer" - TM 4752 - Demand

Form 3811                    **Domestic Return Receipt**

**2. Article Number**

7107 2287 2530 0008 2480

Reorder Form LCD-811 rev. 01/07
1-800-538-4900
www.printcertifiedmail.com

1. Article Addressed to:

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131st Street, Suite 2
New York, NY 10037

5/7/2009  10:14 AM

File: "Shadowboxer" - TM 4752 - Demand

PS Form 3811                    Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                               ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from Item 1?  ☐ Yes
   If YES enter delivery address below:        ☐ No

3. Service Type    ☒ Certified

4. Restricted Delivery? (Extra Fee)    ☐ Yes



RECEIVED

MAY 21 2009

SCREEN ACTORS GUILD
LEGAL DEPARTMENT

INSUFFICIENT ADDRESS
ATTEMPTED NOT KNOWN
NO SUCH NUMBER/STREET
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

☐ OTHER

RTS
RETURN TO SENDER

Undeliverable
As
Addressed

5/11

SCREEN ACTORS GUILD
5757 WILSHIRE BOULEVARD, 7TH FLOOR
LOS ANGELES, CA 90036-3600

Return Service Requested



7107 2287 2530 0008 2480



UNITED STATES POSTAGE
$ 06.07⁰
MAILED FROM ZIP CODE 90036



**ALLISON HOOVER**

**SCREEN ACTORS GUILD**
5757 WILSHIRE BOULEVARD, 7TH FLOOR
LOS ANGELES, CA 90036-3600

Return Service Requested

RECEIVED

MAY 21 2009

SCREEN ACTORS GUILD
LEGAL DEPARTMENT

A ☐☐☐ INSUFFICIENT ADDRESS
C ☐☐☐ ATTEMPTED NOT KNOWN
S ☐☐☐ NO SUCH NUMBER/ STREET
  ☐☐☐ NOT DELIVERABLE AS ADDRESSED
  ☐☐☐ UNABLE TO FORWARD     ☐ OTHER







**"EXHIBIT G "**



LEGAL DEPARTMENT

WRITER'S DIRECT DIAL:
(323) 549-6490

WRITER'S E-MAIL:
dochoa@sag.org

November 10, 2011

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131st Street, Suite 2
New York, NY 10037

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th Street, Suite 1002
New York, NY 10018

Lee Daniels Entertainment, Ltd.
434 Broadway Ste., 403
New York, NY 10013

Re:   *"Shadowboxer"*
      Case No. TM 4752

Dear Parties:

As you know, a Statement of Claim and Demand for Arbitration ("Demand") was filed in the above-referenced matter on May 7, 2009.  Having received no response to its request to select arbitrators the Guild selected Michael Rappaport from the panel of neutral arbitrators to preside over the arbitration in this matter pursuant to Section 9F of the Codified Basic Agreement on **December 8, 2011** at 10:00 a.m. at the Screen Actors Guild office located at 5757 Wilshire Boulevard, 7th Floor, Los Angeles, California.

Copies of all correspondence in this matter should be sent to Delia Ochoa, Screen Actors Guild, Inc., 5757 Wilshire Blvd., 7th Floor, Los Angeles, CA 90036

Very truly yours,

Delia Ochoa
Counsel

Cc:   Michael Rappaport (via email)

**Return Service Requested**

DELI... HOA

**SCREEN ACTORS GUILD**
5757 WILSHIRE BOULEVARD, 7TH FLOOR
LOS ANGELES, CA 90036-3600

To:

**SCREEN ACTORS GUILD**
5757 WILSHIRE BLVD.
LOS ANGELES, CA 90036

Lee Daniels Entertainment, Ltd.
434 Broadway Ste., 403
New York, NY 10013





$ 00.88°

**"EXHIBIT H "**

1
2
3
4
5
6
7
8                     BEFORE THE PRODUCER-SCREEN ACTORS GUILD
9                            SOLE NEUTRAL ARBITRATOR
10
11   SCREEN ACTORS GUILD, INC., a non-profit     )  Case No.: TM 4752
     corporation, on behalf of Affected Performers )
12   and 20 Doe Performers,                       )
13                                                 )  **ARBITRATION AWARD**
                   Claimant,                       )
14                                                 )
     v.                                            )
15                                                 )
     SHADOWBOXER, LLC, and LEE DANIELS            )
16   ENTERTAINMENT, LTD.                          )
17                Respondents.                     )
18                                                 )
19   _____  )
                                                   )
20   Re:    "Shadowboxer"                          )
                                                   )
21
22                            __FINDINGS OF FACT__
23        1.     Notice of the December 8, 2011 hearing was sent via U.S. mail to Shadowboxer,
24   LLC ("Producer") and LEE DANIELS ENTERTAINMENT, LTD ("LDE").
25        2.     Pursuant to proper notice, this matter came to hearing before the undersigned
26   arbitrator on December 8, 2011, at the offices of Screen Actors Guild, Inc., 5757 Wilshire
27   Boulevard, Los Angeles, California, 90036.  Delia N. Ochoa appeared on behalf of claimant,
28   Screen Actors Guild, Inc. ("SAG").  Respondents, Producer and LDE did not attend the

1    hearing, nor sought a continuance.  The matter was considered fully submitted with respect to

2    said Respondent at the close of the hearing.

3        3.      Respondents Producer and LDE are signatory to, or otherwise bound by, the

4    Theatrical Adherence Letter which expressly binds Respondents (Section 1) to the Screen

5    Actors Guild Codified Basic Agreement of 1995 for Independent Producers, as amended

6    ("CBA"), including the provisions (Section 9 of the CBA), related to arbitration of disputes

7    between SAG and Respondents.

8        4.      During the term of the CBA, Producer produced the theatrical motion picture

9    entitled "*Shadowboxer*" (the "Picture").

10        5.      Producer is signatory to a Security Agreement granting SAG a security interest in

11    the Picture, including, but not limited to, the copyright and physical elements of the Picture.

12        6.      LDE is signatory to a Guarantee Agreement securing all of Producer's

13    obligations to the Guild, including the payment of residuals due.

14        7.      The Picture has been released and exploited on free television, pay television

15    and videocassette/DVD and there has been no reporting or payment of residuals or pension

16    and health contributions as required by the CBA.

17        8.      The failure to report and pay residuals and make pension and health

18    contributions ("P&H") has resulted in late payment liquidated damages ("LPLD's) becoming

19    due under the CBA.

20        9.      The failure to pay residuals and make pension and health contributions

21    constitutes an Event of Default under the Security Agreement.

22        10.      SAG properly submitted statements of claim and requests for conciliation as

23    well as statements of claim and demands for arbitration upon Respondents for the amounts

24    due.

25    ///

26    ///

27    ///

28    ///

## AWARD

After consideration of the evidence and arguments submitted, and based upon the foregoing findings of fact, it is the Award of the undersigned Arbitrator that:

1.    Shadowboxer, LLC ("Producer") and Lee Daniels Entertainment, LTD. ("LDE") are in breach of the CBA.

2.    Producer and LDE are hereby ordered to pay to Screen Actors Guild, Inc., on behalf of affected performers, with joint and several liability, the residuals due to performers appearing in the Picture, late payment liquidated damages ("LPLDs"), pension and health contributions ("P&H"), and an estimate of employer-side taxes and payroll house expenses totaling **$335,757.11** which consists of:

| | |
|---|---|
| Residuals: | $ 169,630.22 |
| P&H: | $  25,323.03 |
| LPLDs: | $  93,544.08 |
| **TOTAL:** | $ 288,497.33 |
| + Taxes / Expenses (17.95%)[1] | $  47,239.79 |
| **GRAND TOTAL:** | $ 335,737.11 |

3.    Respondents are ordered to properly payroll the foregoing compensation and LPLDs and deliver individual performer checks (less applicable withholding taxes) to Screen Actors Guild, Inc., Legal Department, 5757 Wilshire Blvd., Los Angeles, CA 90036.

4.    Respondents are further ordered to deliver a check made payable to the "Screen Actors Guild-Producers Pension and Health Plans" for the foregoing pension and health contributions to Screen Actors Guild-Producers Pension and Health Plans, P.O. Box 7830, Burbank, CA 91510-7830.

5.    Pursuant to the CBA, LPLDs shall continue to accrue, without limitation, until the delinquent payments, together with LPLDs, are paid in full.

[1] "Taxes/Expenses" represents a reasonable estimate of the employer-side taxes and payroll house expenses. Producer shall be liable for and shall pay all actual costs incurred in processing payment of the amounts owed hereunder.

6.      Pursuant to the CBA and the Security Agreement, Screen Actors Guild, Inc. is granted an irrevocable assignment of any monies received or to be received by Respondents, including proceeds from the worldwide exploitation, distribution, exhibition, or other use of the motion pictures originally known as *Shadowboxer* until the above sum(s) are paid in full.

7.      Screen Actors Guild Inc. is hereby authorized to release any funds held by SAG as a security deposit so that such funds may be distributed in their entirety to Performers.

8.      The parties are to split the fee of the undersigned Arbitrator evenly.  SAG will advance Respondent's portion of the arbitrator's fee.  However, Respondents shall reimburse SAG  or its pro-rata portion of the fee forthwith.

Dated: _DEC. 8_____, 2011          _____

Michael D. Rappaport, Esq.

Arbitrator

**"EXHIBIT I "**

**SAG·AFTRA.**

November 30, 2015

**VIA U.S. CERTIFIED MAIL**

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131 St., Ste. 2
New York, NY 10037

Shadowboxer, LLC
Attn: Lee Daniels
51 N. 3rd St., #321
Philadelphia, PA 19106

Lee Daniels Entertainment, Ltd.
Agent for the Service of Process
434 Broadway Ste., 403
New York, NY 10013

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th St., Ste. 102
New York, NY 10018

**Re:    Meet and Confer re: Confirmation Motion
        "*Shadowboxer*"– SAG-AFTRA Case No. TM 4752**

Dear Interested Parties:

In connection with the film, "*Shadowboxer*," Screen Actors Guild-American Federation of
Television and Radio Artists ("Union"), as successor-in-interest to Screen Actors Guild, Inc.,
intends to file a motion against Signatory Producer, Shadowboxer, LLC and Lee Daniels
Entertainment, Ltd., for an order confirming an arbitration award and for entry of judgment in
conformity therewith.  The motion will be filed in the United States District Court, Central
District of California, and we will provide you with notice of the motion.

Pursuant to Local Rule 7-3, I attempted to contact the Producer via telephone at the last known
telephone number SAG-AFTRA has on file, provided by Producer, (212) 334-8110 on
November 25, 2015.  The telephone number was out of service. As of the date of this letter,
SAG-AFTRA has not received any communication from the signatory producer.  Monies are still
outstanding in connection with the above film.  If the Union does not receive full and prompt
payment, we will be forced to confirm the arbitration award as a judgment.  Please contact me as
soon as possible to discuss resolution of this matter.

Very truly yours,

Jessica Espinosa
Counsel

Jessica Espinosa, Counsel
jessica.espinosa@sagaftra.org • SAGAFTRA.org • Tel: 323.634.8288/ Fax: 323.549.6624
SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS
5757 Wilshire Blvd., 7th Floor, Los Angeles, CA 90036-3600
Associated Actors & Artistes of America / AFL-CIO

**1.800.538.4900**
www.lasersub.co[m]

LaserSubstrates, Inc.™

## U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
**(Domestic Mail Only; No Insurance Coverage Provided)**

For delivery information visit our website at www.usps.com

7107 2287 2530 0000 0682

| | |
|---|---|
| Postage | $ |
| Certified Fee | $0.49 |
| Return Receipt Fee (Endorsement Required) | $3.30 |
| Restricted Delivery Fee (Endorsement Required) | $2.70 |
| | $0.00 |
| Total Postage & Fees | $  $6.49 |

Postmark Here

Sent To        Batch #:    Shadowboxer, LLC
                  117       Attn: Lee Daniels
Street, Apt. No.;           39 W. 131 St., Ste. 2
or PO Box No.               New York, NY 10037
City, State, Zip+4

PS Form 3800, January 2013      See Reverse for Instructions

Code2:  TM 4752 - Shadowboxes

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL™

7107 2287 2530 0000 0682

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131 St., Ste. 2
New York, NY 10037

Batch #: 117
Article #: 71072287253000000682
Date/Time: 11/30/2015 3:32:47 PM
Code:
Code2: TM 4752 - Shadowboxes
File #:
Internal File #:
Internal Code #:


(1) SEPARATE AT PERFORATION

(2) REMOVE LABEL AND RECEIPT FROM BACKING. PLACE LABEL AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS

---

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

7107 2287 2530 0000 0682

Reorder Form LCD-811 rev. 01/13
1-800-538-4900
www.printcertifiedmail.com

**1. Article Addressed to:**

Batch #:
117

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131 St., Ste. 2
New York, NY 10037

11/30/2015  3:32 PM

Code2:  TM 4752 - Shadowboxes

**A. Signature**
X                          ☐ Agent
                           ☐ Addressee

**B. Received by (Printed Name)**    **C. Date of Delivery**

**D. Is delivery address different from item 1?** ☐ Yes
    If YES enter delivery address below:  ☐ No

**3. Service Type**        ☒ Certified

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

PS Form 3811                    Domestic Return Receipt



---

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

---

JESSICA ESPINOSA
SAG-AFTRA
5757 WILSHIRE BLVD
7TH FLOOR
LOS ANGELES, CA          90036-3600

OPTIONAL LABEL

Shadowboxer, LLC
Attn: Lee Daniels
39 W. 131 St., Ste. 2
New York, NY 10037

(3)

LIFT HERE

1.800.538.4900
*LaserSubstrates, Inc.*
www.lasersub.co

# U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

7107 2287 2530 0000 0736

| | |
|---|---|
| Postage | $ |
| Certified Fee | $0.49 |
| Return Receipt Fee (Endorsement Required) | $3.30 |
| Restricted Delivery Fee (Endorsement Required) | $2.70 |
| | $0.00 |
| Total Postage & Fees | $ $6.49 |

Postmark Here

*Sent To* Batch #: **Shadowboxer, LLC**
122 **Attn: Lee Daniels**
*Street, Apt. No.;* **51 N. 3rd St., #321**
*or PO Box No.* **Philadelphia, PA 19106**
*City, State, Zip+4*

PS Form 3800, January 2019 See Reverse for Instructions

Code2: TM 4752 - Shadowboxer

**CERTIFIED MAIL**™

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7107 2287 2530 0000 0736

Shadowboxer, LLC
Attn: Lee Daniels
51 N. 3rd St., #321
Philadelphia, PA 19106

Batch #: 122
Article #: 71072287253000000736
Date/Time: 11/30/2015 3:44:50 PM
Code:
Code2: TM 4752 - Shadowboxer
File #:
Internal File #:
Internal Code #:



① SEPARATE AT PERFORATION

② REMOVE LABEL AND RECEIPT FROM BACK PLACE LABEL AT TOP ENVELOPE TO THE RIGHT OF THE RETURN ADD

---

## 2. Article Number

7107 2287 2530 0000 0736

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (*Printed Name*) | C. Date of Delivery

**1. Article Addressed to:**

Batch #:
122

Shadowboxer, LLC
Attn: Lee Daniels
51 N. 3rd St., #321
Philadelphia, PA 19106

11/30/2015 3:44 PM

D. Is delivery address different from item 1? ☐ Yes
If YES enter delivery address below: ☐ No

3. Service Type ☒ Certified

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

Code2: TM 4752 - Shadowboxer

PS Form 3811 **Domestic Return Receipt**

Reorder Form LCD-811 rev. 01/13
1-800-538-4900
www.printcertifiedmail.com

---

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**JESSICA ESPINOSA**
**SAG-AFTRA**
**5757 WILSHIRE BLVD**
**7TH FLOOR**
**LOS ANGELES, CA** 90036-3600

OPTIONAL LABEL

Shadowboxer, LLC
Attn: Lee Daniels
51 N. 3rd St., #321
Philadelphia, PA 19106

③

← LIFT HERE

**1.800.538.4900**
LaserSubstrates, Inc.™
www.lasersub.co

## U.S. Postal Service™
### CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

7107 2287 2530 0000 0743

| | |
|---|---|
| Postage | $ |
| Certified Fee | $0.49 |
| Return Receipt Fee (Endorsement Required) | $3.30 |
| Restricted Delivery Fee (Endorsement Required) | $2.70 |
| | $0.00 |
| Total Postage & Fees | $ $6.49 |

Postmark Here

Sent To   Batch #: 123   Lee Daniels Entertainment, Ltd.
Street, Apt. No.;   Agent for the Service of Process
or PO Box No.   434 Broadway Ste., 403
City, State, Zip+4   New York, NY 10013

PS Form 3800, January 2013    See Reverse for Instructions

Code2: TM 4752 - Shadowboxer

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL™**

7107 2287 2530 0000 0743

Lee Daniels Entertainment, Ltd.
Agent for the Service of Process
434 Broadway Ste., 403
New York, NY 10013

Batch #: 123
Article #: 71072287253000000743
Date/Time: 11/30/2015 3:45:52 PM
Code:
Code2: TM 4752 - Shadowboxer
File #:
Internal File #:
Internal Code #:

① SEPARATE AT PERFORATION

② REMOVE LABEL AND RECEIPT FROM BACKING PLACE LABEL AT TOP ENVELOPE TO THE RIGHT OF THE RETURN ADDR

### 2. Article Number

7107 2287 2530 0000 0743

**1. Article Addressed to:**

Batch #:
123

Lee Daniels Entertainment, Ltd.
Agent for the Service of Process
434 Broadway Ste., 403
New York, NY 10013

11/30/2015  3:45 PM

Code2:  TM 4752 - Shadowboxer

Reorder Form LCD-811 rev. 01/13
1-800-538-4900
www.printcertifiedmail.com

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                     ☐ Agent
                                      ☐ Addressee

B. Received by (*Printed Name*)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES enter delivery address below:          ☐ No

3. Service Type        ☒ Certified

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

PS Form 3811                Domestic Return Receipt



**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

||||  ||  ||||  ||||

**JESSICA ESPINOSA**
**SAG-AFTRA**
**5757 WILSHIRE BLVD**
**7TH FLOOR**
**LOS ANGELES, CA**         **90036-3600**

OPTIONAL LABEL

Lee Daniels Entertainment, Ltd.
Agent for the Service of Process
434 Broadway Ste., 403
New York, NY 10013



③   LIFT HERE

**1.800.538.4900**
www.lasersub.c

LaserSubstrates, Inc.™

## U.S. Postal Service™
### CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

7107 2287 2530 0000 0750

| | |
|---|---|
| Postage | $ |
| Certified Fee | $0.49 |
| Return Receipt Fee (Endorsement Required) | $3.30 |
| Restricted Delivery Fee (Endorsement Required) | $2.70 |
| | $0.00 |
| Total Postage & Fees | $ |
| | $6.49 |

Postmark Here

Sent To
Batch #: 124
Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
Street, Apt. No.; or PO Box No.; City, State, Zip+4
315 W. 36th St., Ste. 102
New York, NY 10018

PS Form 3800, January 2013   See Reverse for Instructions

Code2: TM 4752 - Shadowboxer

**CERTIFIED MAIL™**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7107 2287 2530 0000 0750

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th St., Ste. 102
New York, NY 10018

Batch #: 124
Article #: 71072287253000000750
Date/Time: 11/30/2015 3:46:48 PM
Code:
Code2: TM 4752 - Shadowboxer
File #:
Internal File #:
Internal Code #:

(1) SEPARATE AT PERFORATION



(2) REMOVE LABEL AND ... RECEIPT FROM BACK... PLACE LABEL AT TOP... ENVELOPE TO THE R... OF THE RETURN ADD...

---

### 2. Article Number

7107 2287 2530 0000 0750

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent
☐ Addressee

B. Received by (*Printed Name*)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES enter delivery address below:  ☐ No

**1. Article Addressed to:**

Batch #:
124

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th St., Ste. 102
New York, NY 10018

11/30/2015  3:46 PM

Code2:  TM 4752 - Shadowboxer

3. Service Type  ☒ Certified

4. Restricted Delivery? (*Extra Fee*)  ☐ Yes

PS Form 3811     Domestic Return Receipt

Reorder Form LCD-811 rev. 01/13
1-800-538-4900
www.printcertifiedmail.com

---

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

OPTIONAL LABEL

**JESSICA ESPINOSA**
**SAG-AFTRA**
**5757 WILSHIRE BLVD**
**7TH FLOOR**
**LOS ANGELES, CA**     **90036-3600**

Lee Daniels Entertainment, Ltd.
Attn: Lisa Cortes
315 W. 36th St., Ste. 102
New York, NY 10018

(3)

LIFT HERE